UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JACQUES JAAR, Individually and On Behalf Of All Others Similarly Situated, | Case No. _____ |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | DEMAND FOR JURY TRIAL |
| NORTHERN GENESIS ACQUISITION CORP., IAN ROBERTSON, PAUL DALGLISH, MICHAEL HOFFMAN, KEN MANGET, BRAD SPARKES, ROBERT SCHAEFER, THE LION ELECTRIC COMPANY, MARC BEDARD, and NICOLAS BRUNET, | VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934 |
| Defendants. | |

Plaintiff Jacques Jaar ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      Plaintiff brings this action against: Northern Genesis Acquisition Corp. ("NGA"); the founders of NGA who also served as NGA's executive officers and/or directors, identified below (the "NGA Founders"); The Lion Electric Company ("Lion Electric" or the "Company");[1] Lion Electric's Chief Executive Officer and director Marc Bedard ("Bedard"); and Lion Electric's President Nicolas Brunet ("Brunet", and, together with Bedard and the NGA Founders, the "Individual Defendants") for violations of Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"); 15 U.S.C. §§ 78j(b), 78n(a) and 78t(a); SEC Rule 10b-

---

[1]    "Legacy Lion Electric" is used herein to refer to The Lion Electric Company prior to the consummation of the Merger (defined below). NGA, Lion Electric, and the Individual Defendants are collectively referred to herein as the "Defendants".

5, 17 C.F.R. §240.10b-5; and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, in connection with the business combination (the "Merger") between NGA and Legacy Lion Electric, whereby NGA's shareholders were induced to convert their shares in NGA into stock in the post-Merger Lion Electric. As set forth below, Defendants: (i) used materially deceptive "risk factor" statements to withhold the truth about problems facing Legacy Lion Electric, including supply chain problems with its suppliers and sub-suppliers; (ii) misled NGA's stockholders about Lion Electric's prospects using grossly unrealistic financial projections; and (iii) failed to provide NGA stockholders with the "net cash" value of their shares – *the* key disclosure about the fundamental purchasing power their NGA shares represented.

2.      The NGA Founders formed NGA as a special purpose acquisition company ("SPAC"). The NGA Founders then took NGA public and subsequently combined it with Legacy Lion Electric, a company that they presented to SPAC holders as a trailblazing manufacturer of electric trucks and school buses.

3.      Despite being aware of multiple serious business problems with Legacy Lion Electric – including the Company's supply chain problems and habit of entering into sale agreements for vehicles that it had not yet even prototyped – the NGA Founders pursued the Merger in the expectation that they would receive a substantial return on their personally-minimal stakes in the business combination.

4.      Plaintiff and other NGA investors relied on the NGA Founders to select a worthwhile merger candidate and accurately disclose any problems and risks with that candidate in the proxy for the Merger. That was the NGA Founders job: use their investing acumen to select a worthwhile combination target, and then disclose all known and material information about the target so that NGA's stockholders could cast fully informed votes on the proposed combination.

5.      The fundamental premise of the shareholder vote in a de-SPAC transaction is that it presents a SPAC investor with the choice to either support the proposed combination or elect to redeem their shares for cash at no cost. For that choice to be meaningful, it needs to be fully informed. Here, it was not, because the Individual Defendants knew or were reckless in not knowing that Legacy Lion Electric was a lemon but failed to disclose Legacy Lion Electric's problems in the Proxy. This action will hold the Defendants to account.

6.      On March 24, 2021, Defendants caused a materially false, incomplete, and misleading joint proxy statement/prospectus on Schedule 14A (the "Proxy") to be filed with the Securities and Exchange Commission ("SEC") and disseminated to NGA stockholders, in violation of the Exchange Act.

7.      The "Risk Factors" section of the Proxy contained several materially misleading risk statements (the "Proxy Misrepresentations"). First, it contained misleading information concerning supply chain problems at Legacy Lion Electric, describing problems that *had already materialized* as mere risks. The misleading sections concerning these ongoing problems were as follows.

### Challenged Statement I

***Increases in costs, disruption of supply or shortage of raw materials, particularly lithium-ion battery cells, could materially adversely affect Lion's business, results of operations or financial condition.***

Lion may experience increases in the cost or a sustained interruption in the supply or shortage of raw materials. Any such increase in cost or supply interruption or shortage could materially adversely affect Lion's business, results of operations or financial condition. Components in Lion's vehicles are made of various raw materials, including aluminum, steel, carbon fiber, non-ferrous metals (such as copper), and cobalt. The prices for these raw materials fluctuate depending on market conditions and global demand and could materially affect Lion's business, results of operations or financial condition. Although Lion has secured long-term contractual arrangements with suppliers with respect to the supply of key components of its vehicles, including lithium-ion batteries, Lion is nevertheless exposed to multiple risks relating to price fluctuations

for lithium-ion cells. These risks include:

- the inability or unwillingness of current battery manufacturers to build or operate battery cell manufacturing plants to supply the numbers of lithium-ion cells required to support the growth of the electric vehicle industry as demand for such cells increases;

- disruption in the supply of cells due to quality issues or recalls by the battery cell manufacturers;

- increased regulation of supply chains to account for, among other things, environmental and/or human rights risks; and

- an increase in the cost of raw materials used in lithium-ion cells, such as cobalt.

Any disruption in the supply of battery cells or other key vehicle components could temporarily disrupt production of Lion's vehicles until a different supplier is fully qualified. Moreover, battery cell manufacturers may refuse to supply electric vehicle manufacturers if they determine that the vehicles are not sufficiently safe. Furthermore, various fluctuations in market and economic conditions may cause Lion to experience significant increases in freight charges and raw material costs. Substantial increases in the prices for raw materials would increase Lion's operating costs and could reduce Lion's margins if the increased costs cannot be recouped through increased vehicle prices. There can be no assurance that Lion will be able to recoup increasing costs of raw materials by increasing vehicle prices.

## Challenged Statement II

***Lion is dependent on third-party suppliers, some of which are single-source suppliers, and Lion expects to continue to rely on third-party suppliers. The inability of any such supplier to deliver necessary parts or components according to Lion's schedule and at prices, volumes and quality levels acceptable to it, Lion's inability to efficiently manage these parts or components, or the termination or interruption of any supply arrangement could materially adversely affect Lion's business, results of operations or financial condition.***

Lion is dependent on third-party suppliers to supply and manufacture parts and components included in its vehicles, and it expects to continue to rely on third parties to supply and manufacture such parts and components in the future. While Lion obtains components from multiple sources whenever possible, some of the components used in its vehicles, including certain key battery system components, are purchased from a single source. While Lion believes that it may be able to establish alternate supply relationships and can obtain or potentially engineer replacement components for some of its single source components, it may be unable to do so in the short term or at all, or at prices, volumes or quality levels that are acceptable to it. In addition, the inability of any of Lion's suppliers to deliver necessary parts or components according to Lion's schedule

and at prices, volumes or quality levels acceptable to Lion, Lion's inability to efficiently manage these parts or components, or the termination or interruption of any material supply arrangement could materially adversely affect Lion's business, results of operations or financial condition. Any disruption in the supply of parts or components, whether or not from a single source supplier, could temporarily disrupt manufacturing of Lion's vehicles until an alternative supplier is able to supply the required material. Changes in business conditions, unforeseen circumstances, governmental changes, and other factors beyond Lion's control or which it does not presently anticipate, could also affect Lion's suppliers' ability to deliver components to Lion on a timely basis and ultimately, Lion's ability to economically manufacture and distribute its vehicles. Any of the foregoing could materially adversely affect Lion's business, results of operations or financial condition.

### Challenged Statement III

***Lion's success will depend on its ability to economically develop, manufacture and sell its vehicles at scale and meet its customers' business needs. Lion's ability to develop, manufacture and distribute vehicles of sufficient quality and appeal to customers on schedule and at scale is unproven.***

Lion's future business depends in large part on its ability to economically manufacture, market and sell its vehicles at sufficient capacity to meet the transportation demands of its customers. Although it currently develops and manufactures vehicles from its manufacturing facility in Saint-Jérôme, Québec, Lion will need to scale its manufacturing capacity in order to successfully implement its growth strategy, and plans to do so in the future by, among other things, building a large-scale manufacturing facility in the United States and building a battery assembly facility. Although Lion has experience in developing and manufacturing buses and trucks from its existing facility, such operations are currently conducted on a limited scale, and Lion has no experience to date in high volume manufacturing of its vehicles. Lion does not know whether it will be able to develop efficient, automated, low-cost manufacturing capabilities and processes, or whether it will be able to secure reliable sources of component supply, in each case that will enable it to meet the quality, price, engineering, design and production standards, as well as the production volumes, required to successfully mass market its vehicles and meet its business objectives and customer needs. Even if Lion is successful in developing high-volume manufacturing capability and processes and can reliably source component supplies in sufficient volume, it does not know whether it will be able to do so in a manner that avoids significant delays and cost overruns, including as a result of factors beyond its control such as problems with suppliers, or in time to meet the commercialization schedules of future vehicles or to satisfy the requirements of its customers. Lion's ability to effectively reduce its cost structure over time is limited by the fixed nature of many of its planned expenses in the near-term, and its ability to reduce long-term expenses is constrained by its need to continue investment in its growth strategy. Any failure to develop and scale such manufacturing processes and capabilities within Lion's projected costs and timelines could have a material adverse effect on its business, results of operations or financial condition.

8.      Additionally, and as discussed below, the Proxy provided wildly unrealistic

projections (the "Financial Projections") for Lion Electric:

**Challenged Statement IV**

| | July 2020 Forecast | | | | |
| | Fiscal Year Ended December 31, | | | | |
| | 2020E | 2021E | 2022E | 2023E | 2024E |
| | | | (in millions) | | |
| Revenue | $ 29 | $204 | $ 668 | $1,672 | $3,625 |
| Adjusted EBITDA | (4) | 29 | 119 | 295 | 707 |

9.   Further, the Proxy failed to disclose the net cash represented by NGA's shares in any of the financial statements provided in the Proxy or in any other statement concerning the cash held in trust by NGA, including the financial statements at F-4 and F-6 (**Challenged Statement V**).

10.   As detailed below, the NGA Founders knew or were reckless in not knowing of Lion Electric's business problems through their due diligence of Lion Electric, and Bedard and Brunet either knew or were reckless in not knowing of Lion Electric's problems through their experience managing Legacy Lion Electric's business operations.

11.   Moreover, the Individual Defendants knew or were reckless in not knowing that the Financial Projections were objectively unrealistic.

12.   Further, all Individual Defendants understood or were reckless in not understanding that NGA's net cash per share was a key metric in the Merger: the NGA Founders understood or should have understood that it represented the fundamental purchasing power NGA's shares represented, and Bedard and Brunet understood or should have understood that it represented the capital that Lion Electric would receive as a result of the Merger. As a result, the Individual Defendants knew or were reckless in not knowing that net cash per share was a material metric that was required to be disclosed to NGA stockholders.

13.   All Individual Defendants are therefore liable for the Proxy Misrepresentations.

14.   As information about Lion Electric's ongoing supply chain and manufacturing problems publicly came to light in 2022 and 2023 and the market incorporated news of Lion Electric's flaws into the Company's stock price, Lion Electric's share price progressively dropped,

ultimately destroying hundreds of millions of dollars in shareholder wealth.

15.     As the market would learn during this period and afterwards, Lion Electric routinely experienced multi-month delays obtaining components from suppliers and sub-suppliers.

16.     As of the filing of this Complaint, the SPAC shares that cost NGA's ordinary investors $10 each trade as Lion Electric shares priced at just over $1.

17.     As further detailed below, the Individual Defendants lied about and obscured Legacy Lion Electric's problems because they had powerful and conflicted incentives to cause NGA and Legacy Lion Electric to enter into a business combination and avoid returning cash to the SPAC's investors regardless of target company quality.

18.     NGA's stockholders voted to approve the Merger and forego their redemption rights as a direct result of the Proxy Misrepresentations.

19.     The Merger closed on May 6, 2021, permanently depriving NGA's common investors of the ability to recover their cash investments in the SPAC. The Merger was effectuated by having Lion Electric Merger Sub Inc., a Delaware corporation and wholly-owned subsidiary of Lion Electric, merge through a statutory merger with and into NGA, with NGA continuing as the surviving corporation and a wholly-owned subsidiary of Lion Electric.

20.     For these reasons, and as detailed herein, Plaintiff asserts claims against the Defendants under Sections 10(b), 14(a), and 20(a) of the Exchange Act to recover the damages caused by their violations.

## JURISDICTION AND VENUE

21.     This Court has original jurisdiction over this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 10(b), 14(a), and 20(a) of the Exchange Act.

22.     Personal jurisdiction exists over each Defendant. "In securities cases like this one

involving securities listed on domestic exchanges, Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa…establishes the exclusive basis for personal jurisdiction." *SEC v. Straub*, 921 F. Supp. 2d 244, 252 (S.D.N.Y. 2013). "Because the Exchange Act authorizes worldwide service of process, the relevant contacts for purposes of the 'minimum contacts' analysis are those with the United States as a whole." In re Banco Bradesco S.A. Sec. Litig., 277 F. Supp. 3d 600, 642 (S.D.N.Y. 2017).

23.     This Court has personal jurisdiction over NGA and the NGA Founders because: NGA is a Delaware corporation that, prior to the Merger, maintained its principal office in Kansas City, Missouri; prior to the Merger, NGA was listed on the New York Stock Exchange ("NYSE"), which is based in New York; NGA retained and worked with Barclays Capital Inc., a New York-headquartered financial advisor, to assist it with due diligence and provide capital markets advisory services in connection with the Merger; NGA's transfer agent, Continental Stock Transfer & Trust Company, was based in New York; NGA's proxy solicitor, D.F. King & Co., Inc., was based in New York; NGA merged with a company that is now listed on the NYSE; NGA director Michael Hoffman is a founder of Stone Capital Partners, which is based in New York, and thus likely either resides or works in New York; and NGA utilized advisors located in New York in connection with its initial public offering, including Graubard Miller and Ellenoff Grossman & Schole LLP. Further, the NGA Founders were directors and/or officers of NGA, and thus had extensive contacts with the United States based upon the above-referenced activities they caused NGA to engage in within the United States.

24.     This Court has personal jurisdiction over Lion Electric and Bedard and Brunet because: Lion Electric entered into the Merger with NGA, a Delaware corporation headquartered in Kansas City, Missouri, by causing its wholly-owned subsidiary that was a Delaware corporation

to merge with and into NGA; Lion Electric is listed on the NYSE; Lion Electric utilized advisors located in New York in connection with the Merger, including Vinson & Elkins L.L.P.; Lion Electric merged with NGA, which was listed on the NYSE; and Lion Electric engages in extensive business within New York and the United States and maintains "Experience Centers" in Green Island, New York and Sacramento, California and a manufacturing facility in Joliet, Illinois. Further, Bedard and Brunet are directors and/or officers of Lion Electric, and thus had extensive contacts with the United States based upon the above-referenced activities they caused Lion Electric to engage in within the United States.

25.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391(b)(3). Under 15 U.S.C. § 78aa, any suit or action to enforce any liability or duty created by the Exchange Act or rules and regulations thereunder may be brought in "the district wherein any act or transaction constituting the violation occurred" or "in the district wherein the defendant is found or is an inhabitant or transacts business[.]" *Id*. Venue is proper in this District under the statute because Defendants transacted business in this District in connection with or in furtherance of their violations of the Exchange Act, as reflected by the above-referenced contacts and engagements they had with New York-based entities.

## THE PARTIES AND RELEVANT NON-PARTIES

### A.     Plaintiff

26.     Plaintiff Jacques Jaar continuously held, and was the beneficial owner of NGA stock, including prior to the redemption deadline, and was entitled to redeem his NGA shares.

### B.     Defendants

27.     Northern Genesis Acquisition Corp. (defined above as "NGA") is a blank check company incorporated on May 27, 2020 as a Delaware corporation for the purpose of effecting a

merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses. Prior to the Merger, its principal executive offices were located at 4801 Main Street Suite 100, Kansas City, Missouri. NGA survived the Merger as a wholly-owned subsidiary of Lion Electric.

28.    Defendant Robertson co-founded NGA on May 27, 2020. Robertson was an NGA director from May 2020 to May 2021, its CEO, Secretary, and Treasurer from May 2020 to June 2020, and its Vice Chairman from June 2020 to May 2021. Robertson co-founded Northern Genesis Acquisition Corp. II ("NGA II") on September 25, 2020. Robertson was NGA II's CEO and a director from October 2020 to November 2021. Robertson co-founded Northern Genesis Acquisition Corp. III ("NGA III") on January 11, 2021. Robertson was NGA III's CEO and a director from January 2021 to April 2023. Robertson is a managing member of Northern Genesis Sponsor, LLC ("Sponsor") and currently CEO of Northern Genesis Capital Group.

29.    Defendant Dalglish co-founded NGA on May 27, 2020.  Dalglish was an NGA director in June 2020 and Chairman from July 2020 to May 2021.  Dalglish co-founded NGA II on September 25, 2020.  Dalglish was an NGA II director from September 2020 to November 2021. Dalglish co-founded NGA III on January 11, 2021.  Dalglish was an NGA III director from January 2021 to April 2023.

30.    Defendant Hoffman co-founded NGA on May 27, 2020.  Hoffman was NGA's President from July 2020 to May 2021.  Hoffman co-founded NGA II on September 25, 2020. Hoffman was NGA II's President from September 2020 to November 2021.  Hoffman co-founded NGA III on January 11, 2021.  Hoffman was NGA III's President from January 2021 to April 2023. Hoffman is currently an employee of Northern Genesis Capital Group.

31.    Defendant Manget co-founded NGA on May 27, 2020.  Manget was NGA's CFO

- 10 -

from June 2020 to May 2021 and a director from July 2020 to May 2021. Manget co-founded NGA II on September 25, 2020. Manget was NGA II's CFO from September 2020 to November 2021. Manget co-founded NGA III on January 11, 2021. Manget was NGA III's CFO from January 2021 to April 2023.

32.    Defendant Sparkes co-founded NGA on May 27, 2020. Sparkes was an NGA director from July 2020 to May 2021. Sparkes was an NGA II director from October 2020 to November 2021. Sparkes co-founded NGA II on September 25, 2020. Sparkes co-founded NGA III on January 11, 2021. Sparkes was an NGA III director from January 2021 to April 2023.

33.    Defendant Schaefer co-founded NGA on May 27, 2020. Schaefer was an NGA director from July 2020 to May 2021. Schaefer co-founded NGA II on September 25, 2020. Schaefer was an NGA II director from October 2020 to November 2021. Schaefer co-founded NGA III on January 11, 2021. Schaefer was an NGA III director from January 2021 to April 2023.

34.    Defendants Robertson, Dalglish, Hoffman, Manget, Sparkes, and Schaefer are collectively referred to herein as the "NGA Founders".

35.    Defendant The Lion Electric Company (defined above as "Lion Electric" or the "Company") is a Quebec corporation with principal executive offices at 921 chemin de la Rivière-du-Nord, Saint-Jérôme, Quebec, Canada. It maintains the legal name of the pre-Merger entity.

36.    Defendant Marc Bedard was the Chief Executive Officer of Legacy Lion Electric and continues to be the Chief Executive Officer of the Company. He was also a Legacy Lion Electric director and continues to be a director of the Company.

37.    Defendant Nicolas Brunet was the EVP and CFO of Legacy Lion Electric since 2019. He has been the Company's President since September 2023.

C.     **Relevant Non-Party**

38.     Northern Genesis Sponsor, LLC ("Sponsor") was a Delaware limited liability company with principal executive offices at 4801 Main Street Suite 100, Kansas City, Missouri.

## SUBSTANTIVE ALLEGATIONS

A.     **Background of Lion Electric**

39.     Lion Electric markets itself as a designer, manufacturer, and direct seller of electric school buses and trucks.

40.     Legacy Lion Electric announced a business combination with NGA on November 30, 2020.

41.     On May 6, 2021, NGA completed the Merger with Legacy Lion Electric, which continues to operate as The Lion Electric Company. NGA survived the Merger as a wholly-owned subsidiary of Lion Electric Company.

B.     **The NGA Founders Form NGA and Structure Their Interests in It to Provide Them with Near-Guaranteed Returns Even in the Event its Merger Target Failed as a Business.**

42.     On May 27, 2020, the NGA Founders formed NGA.

43.     Each of the NGA Founders was a founder of NGA and a member of its Sponsor.

44.     Immediately before entering into the Merger, Sponsor owned 7,986,336 founder shares of NGA (the "Founder Shares"), which Sponsor had acquired from NGA for just $25,000 (i.e., $0.003 per share). At the time the Merger was announced, the Sponsor's Founder Shares were worth nearly $112 million. Even at Lion Electric's current depressed price level, the NGA Founders' Founder Shares still represent a *400x* return on that initial $25,000 investment.

45.     Concurrently with the IPO, Sponsor purchased 8,139,069 warrants (the "Private Placement Warrants") at a price of $1 per warrant. Based on a five-day volume weighted average price of $3.31 per warrant in the days immediately preceding the announcement of the Merger,

those Private Placement Warrants were worth over $26.8 million.  In addition, the Sponsor loaned $3 million to NGA (the "Working Capital Loan").  In connection with the Merger, the promissory note for the Working Capital Loan was converted into 3,000,000 additional warrants, valued at $9.93 million at the time the Merger was announced. Thus, using market valuations, the Sponsor's interest in NGA at the time the Merger was announced totaled over $146 million.

46.     The Sponsor agreed to distribute Founder Shares and Private Placement Warrants to its members after the closing of the Merger, including to the supposedly "independent" directors of NGA—Dalglish, Schaefer and Sparkes—each of whom was an NGA co-founder.  The "independent" directors paid a total of $675,000 for their membership interests in the Sponsor, which provided them with rights to 675,000 warrants and 525,000 Founder Shares.  Based on NGA's stock price at the time of the Merger announcement, Dalglish, Schaefer, and Sparkes were set to receive stock that the market valued at roughly $7.5 million and warrants that the market valued at $2.23 million, **providing an incredible 1,400% return on their $675,000 investment**.

47.     Importantly, these Founder Shares and Private Placement Warrants would become *worthless* if NGA did not enter into a business combination within the time specified in its charter. The holders of Founder Shares waived their rights to a liquidating distribution from the Trust (as defined herein) if NGA did not consummate a business combination.  The Private Placement Warrants were also not transferable, assignable, or saleable by the Sponsor or its permitted transferees until after the close of NGA's initial business combination.  Thus, if NGA did not enter into an initial business combination, the NGA Founders would miss their chance to make millions of dollars and their investment would expire as worthless.  Therefore, the SPAC's structure incentivized the NGA Founders to favor *any deal* over liquidation, providing them with a perverse incentive to complete a merger regardless of whether it was in the best interests of NGA's public

stockholders.

48.     Adding to these perverse incentives for the "independent directors," NGA was just one of *three* SPACs created by Robertson and Hoffman. Robertson and Hoffman are all executives at Northern Genesis Capital Group.  In addition to their service on the NGA Board, each of the "independent directors"—Dalglish, Schaefer, and Sparkes—were also directors at two other Northern Genesis SPACs and stood to gain materially from those roles.

49.     In order to close the Merger, Defendants needed NGA's stockholders to vote in favor of the deal.  Given Defendants' powerful incentives to close a business combination with minimal redemptions, it was no surprise that they disseminated the false and misleading Proxy to secure stockholder approval.

50.     Relying on the veracity of the Proxy, the vast majority of NGA's stockholders, including Plaintiff, determined not to exercise their redemption rights and to instead invest in the Merger.  On May 6, 2021, NGA completed the Merger with Legacy Lion Electric.

51.     The NGA Founders knew that even a bad deal that resulted in a post-Merger stock price drop well below the $10 per share redemption value was much better for them than no deal at all.  Even a bad deal would still provide them with a financial windfall.

52.     Without a deal, however, NGA would be forced to liquidate, in which case the NGA Founders' Founder Shares and Private Placement Warrants would be worth nothing.  The Sponsor would lose its $8,139,069 investment in NGA, and the "independent directors" would lose their $675,000 investment in the Sponsor.

53.     In sum, the NGA Founders structurally incentivized themselves to close a combination regardless of target company quality. Even a bad deal would leave the NGA Founders far better off than no deal at all.

**C.**     **The Conflicted Defendants Pursue the Merger and Conduct Extensive Due Diligence of Legacy Lion Electric's Operations and Prospects. Despite Red Flags, Defendants Choose to Proceed.**

54.     On August 20, 2020, NGA consummated its IPO, selling 30,000,000 units at a price of $10 per unit. Each unit consisted of one share of common stock and one-half of one redeemable warrant. Simultaneously with the IPO, NGA sold 7,750,000 Private Placement Warrants to the Sponsor at a price of $1 per warrant, generating proceeds of $7.75 million. On or around August 27, 2020, the underwriters partially exercised an overallotment, with NGA selling an additional 1,945,344 units and 389,069 Private Placement Warrants. NGA placed the funds raised in the IPO (after deducting underwriting fees and reserving $1.4 million for working capital) fees into the trust account (the "Trust") for the benefit of NGA's stockholders.

55.     On May 27, 2020, the Sponsor paid $25,000 to acquire 8,625,000 shares of NGA's stock (the Founder Shares).  After the underwriters only partially executed their overallotment, the Sponsor forfeited 638,664 Founder Shares, leaving it with 7,986,336 Founder Shares.

56.     On August 19, 2020, a representative of BMO Capital Markets ("BMO") discussed with Robertson whether NGA was interested in engaging in a business combination with Legacy Lion Electric. Robertson caused the Sponsor, on behalf of NGA, to enter into a confidentiality agreement with Legacy Lion Electric that day.

57.     The next day, August 20, 2020, Legacy Lion Electric provided Robertson with a confidential information package on the company.

58.     Legacy Lion Electric was a manufacturer of electric commercial vehicles, such as school buses and garbage trucks.

59.     Though founded in 2011, Legacy Lion Electric rebranded itself in 2017 as "The Lion Electric Company" and began to focus on fully electric applications.

60.     Accordingly, Legacy Lion Electric was a relatively new company with only approximately $23 million in revenue in 2020.

61.     Legacy Lion Electric did not have defined barriers or sustainable competitive advantages; it was a new company and analysts constantly expressed concern that established industry players would soon enter the electric market.

62.     Further, as a new company, Legacy Lion Electric did not have predictable revenues. Legacy Lion Electric also faced significant technology, scale-up, and market risk; it was in the middle of a massive capital-intensive project of expanding its manufacturing facilities into the United States, which it needed to scale up its operations to sell the thousands of vehicles the Proxy claimed would occur, and thus success would need future capital raises to achieve growth plans.

63.     On August 21, 2020, Robertson contacted BMO and set up a meeting for himself and Manget at Legacy Lion Electric's offices and factory in Canada for August 25, 2020.

64.     After the August 25 meeting, the NGA Founders decided NGA should hire an investment banking firm.  Without any Board involvement, NGA retained Barclays specifically to help NGA with due diligence and advisory services.

65.     On September 8, 2020, NGA presented Legacy Lion Electric with a non-binding transaction proposal.  The proposal valued Legacy Lion Electric at $3.5 billion, an enterprise valuation "based on a 10x to 15x multiple of [Legacy] Lion [Electric]'s estimated 2024 [earnings before interest, taxes, depreciation, and amortization ("EBITDA")], discounted to present value using an annual discount rate of 20%."

66.     Legacy Lion Electric granted NGA access to an electronic data room and Barclays and NGA conducted due diligence sessions with Legacy Lion Electric over a one-week period spanning September 9, 2020 and September 16, 2020.

67.    NGA representatives including some or all of the NGA Founders met with Legacy Lion Electric representatives on September 17, 2020. That same day, NGA sent a letter of intent to Legacy Lion Electric.

68.    Over the next 5 days, NGA and Legacy Lion Electric negotiated the terms of the letter of intent.  On September 22, 2020, NGA sent Legacy Lion Electric the agreed upon letter of intent.

69.    On September 28, 2021, the NGA Board held its first meeting.

70.    In October 2020, NGA retained an industry consultant and a consulting firm to further assist NGA's management in its review of Legacy Lion Electric.  Further, NGA management retained KPMG for financial and tax due diligence assistance.

71.    Beginning in October, Barclays began contacting prospective investors to gauge interest for a $500 million PIPE in connection with the Merger.  Although the Proxy does not indicate the NGA Board actually met to discuss the PIPE investment, it mentions that NGA management solicited comments and feedback from Board members on the presentation that NGA prepared for potential PIPE investors.

72.    On October 23, 2020, Barclays provided NGA's management with "feedback provided by prospective investors in the PIPE Financing, including with respect to the implied pre-money valuation of [Legacy Lion Electric]."  Although the Proxy does not provide any detail on the feedback or Barclays' views, NGA and Legacy Lion Electric cut Legacy Lion Electric's valuation roughly in half, reducing it to $1.5 billion and drastically reducing the amount sought in the PIPE financing. The Proxy contains no further information about this massive valuation cut or the reduction in the amount of PIPE financing that Legacy Lion Electric and NGA sought.

73.    From October 16, 2020 through November 29, 2020, NGA and Legacy Lion Electric

and their representatives worked on the Merger Agreement and related documents. The composition of the Board of Lion Electric was among the items addressed during these conversations.

74.    On November 29, 2020, the Board held its second meeting and approved the Merger and related agreements. NGA announced the Merger on November 30, 2020.

75.    On December 8, 2020, Defendants filed with the SEC an Investor Presentation, which they used to attract investors. The Investor Presentation attributed a value of $10 to NGA shares.

76.    Contemporaneously with entering into the Merger, the Sponsor agreed to loan NGA funds ostensibly to cover Merger transaction costs. In February and March 2021, the Sponsor loaned NGA a total of $3 million. At the same time as they approved the Merger, stockholders approved an amendment to NGA's certificate that converted the $3 million loan into 3 million warrants that were identical to the Sponsor's Private Placement Warrants at a price of $1 per share. The Proxy states that if these warrants were unrestricted and freely tradable, they would be worth approximately $22.5 million.

**D.    Defendants Issue the Materially False and Misleading Proxy**

77.    On March 24, 2021, Defendants caused the materially false, misleading, and omissive Proxy to be filed with the SEC.

78.    First, rather than disclosing Legacy Lion Electric's grave and ongoing supply chain problems and product failures, Defendants couched Challenged Statements I-III in hypothetical and generic language that concealed that the so-called "risks" facing Legacy Lion Electric had already materialized.

79.    Second, Defendants provided NGA stockholders with grossly unrealistic Financial

Projections for Lion Electric (Challenged Statement IV).

80.    NGA and the NGA Founders knew or were reckless in not knowing that the Financial Projections were grossly unrealistic based on ongoing problems with Legacy Lion Electric that were uncovered or should have been uncovered through NGA's due diligence of Lion Electric. Further, Lion Electric, Bedard and Brunet also had control over the contents of the joint Proxy and knew of Legacy Lion Electric's problems and that the Financial Projections reflected a grossly unrealistic estimate of Lion Electric's prospects. They nevertheless allowed the materially false and misleading Proxy to be disseminated to NGA stockholders.

81.    Third, the Proxy failed to disclose the purchasing power NGA's shares possessed in the Merger, as reflected by NGA's net cash per share or a similar metric representing NGA's buying power on a per share basis.

82.    This information was important to all the Individual Defendants: the NGA Founders understood or should have understood that it represented the fundamental purchasing power NGA's shares represented; Bedard and Brunet understood or should have understood that it represented the capital that Lion Electric would receive as a result of the Merger. Therefore, all the Individual Defendants knew or were reckless in not knowing that NGA's net cash per share was important information for NGA's stockholders. The Individual Defendants also failed to provide sufficient information to allow NGA's stockholders to calculate NGA's net cash per share for themselves.

83.    Because the Proxy failed to disclose NGA's net cash per share, the Proxy and in particular the financial statements at F-4 and F-6 were materially omissive (Challenged Statement V).

84.    In sum, the Proxy's "Risk Factor" statements utterly failed to inform stockholders that the risks and Lion Electric's ongoing problems had already materialized, the Financial

Projections for Lion Electric were grossly overstated, unachievable, and objectively unreasonable, and the Proxy failed to disclose the best representation of NGA's per-share buying power in the Merger. The Proxy was therefore materially false, misleading, and omissive.

**E.      2022-2023 – The Rubber Hits the Road**

85.      The Merger closed on May 6, 2021.

86.      For the remainder of the year, Lion Electric's stock sustained its price on speculative fumes, reaching a first-half 2021 high above $20.00 per share in June 2021 and a second-half 2021 high above $14.00 per share in October.

87.      During 2022-2023, Lion Electric's business problems and unrealistic projections became impossible to conceal further.

**(i)      The Truth about Lion Electric's Supply Chain Problems and Financial Projections Comes to Light Publicly**

88.      On March 29, 2022, Lion Electric filed its first post-close Annual Report.

89.      That report, which discussed the Company's performance in FY2021, revealed that Lion Electric had generated a mere **$57.7 million** in revenue for the year, as compared to the **$204 million** forecasted for the year in the Proxy. Likewise, Lion Electric's EBITDA ("earnings" *before* interest, taxes, depreciation, and amortization) was **negative** $27.6 million, as compared to the Proxy's **positive** $29 million forecast.

90.      *I.e.*, Lion Electric had generated barely more than a quarter of the revenue Defendants had forecasted for Lion Electric for FY2021, the Company was EBITDA negative, not EBITDA positive, and its true cash flow *after* factoring in the cost of interest, taxes, depreciation, and amortization was necessarily even lower.

91.      Notably too, the March 29, 2022 Annual Report acknowledged Lion Electric's ongoing supply chain problems and partially acknowledged the Company's product problems.

According to the Report, the Company:

- "***has experienced and may continue to experience*** increases in the cost ***or a sustained interruption in the supply or shortage of raw materials***, including as a result of the current global supply chain disruptions or other factors which may or may not be specific to Lion."

- "***has in the past experienced delays in the design and launch of new products***. Any delay in the financing, design, production and launch of new models, including future production of the aforementioned all-electric trucks, school buses and ambulance, or in doing so cost-effectively and with high quality, could harm Lion's reputation and brand or materially adversely affect its business, results of operations or financial condition."

92.     That day, the Company's stock price closed at $8.95. On April 1, the end of the same week, its stock closed at $8.17. By mid April, it traded at barely more than $7.00 per share.

93.     On May 4, 2022, Lion Electric held its earnings call for Q1 2022. On the call, Lion Electric's CEO (Marc Bedard) described the Company's supply chain situation as "quite fragile". The following day, the Company's stock price closed at $6.04 per share.

94.     On August 5, 2022, the Company held its earnings call for Q2 2022. In response to an analyst question about the Company's supply chain problems, Bedard finally revealed that the Company was experiencing **multi-month delays of four to five months in its supply chain**, stating that **"we do have like four months, five months of delay when receiving … parts"**. Bedard also disclosed that the Company was continuing to "seek new alternate suppliers."

95.     Lion Electric's trading price closed the next day at $5.56 per share.

96.     On November 10, 2022, the Company held its Q3 2022 earnings call, its final earnings call in the year. There, Bedard disclosed that the Company's supply chain problems involved delays with both Lion Electric's immediate suppliers *and* the Company's sub-suppliers (i.e., the suppliers to the Company's suppliers). As revealed by Bedard:

"[W]e still experience continued challenges at both the supplier and sub-supplier levels, which is causing disruptions for some parts. We do not expect those supply

chain challenges to disappear in the short term and expect to continue to see challenges at least through 2023."

97.     The Company's share price closed the next day at $3.68.

98.     It would end the year at barely more than $2.00 per share.

99.     Lion Electric's total revenue for FY2022 was $139.9 million, a fraction of the $668 million forecasted for FY2022 in the Financial Projection.

100.    The following year, FY2023, Lion Electric's total revenue was $253.5 million, as compared to the $1.67 *billion* forecasted in the Financial Projections.

101.    Over this two year period, Lion Electric sold a grand total of 1,371 vehicles.

102.    As put by a former national sales manager at Legacy Lion Electric and Lion Electric in an interview in 2023, "[i]t seemed like we were trying to build more stock buyers than we were to actually sell product."

103.    Further news of problems at the Company continued to leak.

104.    Multiple former Lion Electric employees described "safety issues galore" at the Company's manufacturing facilities, "poorly enforced processes and best practices", "lack of process", a failure to implement consistent guidelines within departments "which confuses the suppliers", "disorganized management", "major lack of organization", and "zero structure or planning".

105.    A driver of Lion Electric's school buses described the buses as follows:

- "There's about 16 percent of them in the shop at any given time with issues."

- "You get a new bus, you just get everything moved onto your new bus, then it's in the shop. Then you're driving around in an older spare that's 10 to 12 years old."

- "They [the buses] didn't have the software for the chargers; they only had the software for the rapid chargers and we don't have any rapid chargers."

- "I ran out of power on the way back from a school trip last year[.] I took a band trip up, and on the way back, I realized I wasn't going to make it. I radioed the depot and they met me at another driver's home that had a charger.... We just swapped out buses and I continued on with the diesel bus and left the electric there to charge."

- "If I had to take a team from Westisle down to Souris, I'd need four electric buses each way to make the trip."

106.    As of the filing of this Complaint, Lion Electric trades at barely more than $1 per share.

### (ii)    Investors Come to Understand the Importance of Net Cash Per Share Disclosures in a de-SPAC Transaction

107.    In June 2022, Professors Michael Klausner, Michael Ohlrogge, and Harald Halbhuber published a paper that illuminated the importance of net cash per share to SPAC investors:

> When a SPAC merges, the $10 that investors paid for units in the SPAC's IPO will have been diluted and dissipated in several ways. It is diluted initially at the time of the IPO, but the extent of dilution can increase or decrease by the time of the merger. It is at the time of the merger that SPAC shareholders make their investment decision—whether to invest in a proposed merger or redeem their shares. Accordingly, when a SPAC proposes a merger, shareholders must be informed of how much net cash remains underlying their shares—that is, how much cash will actually be invested in the target company. […]

> The net cash per share in a SPAC is the amount of cash a SPAC shareholder will in effect invest in a merger, on a per share basis, after accounting for dilution and dissipated cash. That amount of cash will be closely related to the value of target shares the SPAC shareholder will receive, and hence is highly material to the shareholder's investment decision. Unless the target expects to derive significant non-cash value by merging with a SPAC, one would expect a target company to exchange roughly $6 of value for a SPAC share with underlying net cash of $6. If it does, the post-merger value of the SPAC share will be $6. […]

> Net cash per share is calculated as follows:

$$\frac{\text{Total Cash (From SPAC Public Shareholders + PIPE/FPA)} - \text{Cash Expenses} - \text{Value of Warrants} - \text{Value of Other Equity Derivatives}}{\text{Public Shares + Founder Shares + PIPE/FPA Shares + Other Shares + Shares Issuable Under Rights}}$$

[…] Because net cash per share should be central to a shareholder's evaluation of a proposed merger, the results of these calculations should be included in the summary of the proxy statement. SPACs should also disclose their best available estimate of net cash per share at the time they announce their mergers, since this is when many investors will make a decision whether to buy shares in the SPAC. Finally, in filings made after their mergers, SPACs should include the actual net cash per share delivered, given actual redemptions and final accounts of costs.

Michael Klausner, Michael Ohlrogge & Harald Halbhuber, *Net Cash Per Share: The Key to Disclosing SPAC Dilution*, 40 Yale J. on Regul. 18 (June 2022).

108.    The significance of net cash per share has since been recognized as a critical metric for investors in SPACs to be provided with.

## CLASS ACTION ALLEGATIONS

109.    Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and other public stockholders of NGA who held common stock as of the record date (March 18, 2021) and were harmed by Defendants' conduct alleged herein (the "Class"). Excluded from the Class are the Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant. This action is properly maintainable as a class action because:

(a)    the Class is so numerous that joinder of all members is impracticable. As of the record date to vote on the Merger, there were 39,931,680 shares of NGA common stock outstanding, of which 31,945,344 were held by thousands of unaffiliated shareholders throughout the country. The actual number of former public stockholders of NGA will be ascertained through discovery;

(b)    there are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i.  whether Defendants misrepresented material information in the Proxy in violation of Sections 10(b) and 14(a) of the Exchange Act;

ii.  whether the Individual Defendants violated Section 20(a) of the
Exchange Act; and

iii.  whether the Class suffered damages.

(c)  Plaintiff is an adequate representative of the Class, has retained competent
counsel experienced in litigation of this nature, and will fairly and adequately protect the
interests of the Class;

(d)  Plaintiff's claims are typical of the claims of the other members of the Class
and Plaintiff does not have any interests adverse to the Class;

(e)  the prosecution of separate actions by individual members of the Class would
create a risk of inconsistent or varying adjudications with respect to individual members of the
Class, which would establish incompatible standards of conduct for the party opposing the
Class;

(f)  Defendants have acted on grounds generally applicable to the Class with
respect to the matters complained of herein, thereby making appropriate the relief sought herein
with respect to the Class as a whole; and

(g)  a class action is superior to other available methods for fairly and efficiently
adjudicating the controversy.

**COUNT I**
**Against all Defendants**
**for Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

110.  Plaintiff reiterates each and every allegation set forth above as if fully set forth herein.

111.  Defendants made the false statements specified above, which they knew or recklessly
disregarded were misleading in that they contained misrepresentations and failed to disclose material
facts necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading.

112.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with the purchase or sale of NGA common stock.

113.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for NGA common stock prior to the close of the Merger and for Lion Electric stock after the close of the Merger. Plaintiff and the Class would not have purchased NGA or Lion Electric common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

114.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases or sales of NGA and Lion Electric common stock during the Class Period.

**COUNT II**
**Against all Defendants**
**for Violations of Section 14(a) of the Exchange Act**

115.    This Count does not sound in fraud. Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct and does not allege that Defendants had scienter or fraudulent intent with respect to this Count, as they are not elements of a §14(a) claim. This claim is based solely on negligence.

116.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national

securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

117.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

118.    Defendants had the ability to prevent the issuance of the materially misleading Proxy or to cause the Proxy to be corrected so that it was not in violation of §14(a) of the Exchange Act.

119.    The Proxy was prepared, reviewed, and/or disseminated by Defendants. The Proxy misrepresented and/or omitted material facts, as detailed above. Defendants were negligent in filing the Proxy with these materially false and misleading statements.

120.    As stated herein, the Proxy contained untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading in violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. The Proxy was an essential link in the consummation of the Merger. Defendants also failed to correct the Proxy prior to the Merger and the failure to update and correct false statements is also a violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

121.    NGA is liable for violations of Rule 14a-9 as the issuing entity of the Proxy and based on the NGA Founders' violations of the Exchange Act.

122.     Lion Electric is liable for violations of Rule 14a-9 based on its control over the contents of the Proxy and based on Bedard's and Brunet's violations of the Exchange Act.

123.     The above-referenced information that was mispresented and omitted in the Proxy was material to Plaintiff and the Class, who were deprived of their right to cast an informed vote because such misrepresentations and omissions were not corrected prior to the vote on the Merger and rendered the above-refenced sections of the Proxy materially false, misleading, and omissive.

124.     By reason of the misconduct detailed herein, all Defendants are liable pursuant to Section 14(a) of the Exchange Act and SEC Rule 14a-9.

125.     As a direct and proximate result of the dissemination of the materially false, misleading, and incomplete Proxy, Plaintiff and the Class have suffered damages and actual economic losses in an amount to be determined at trial.

## COUNT III
### Against All Individual Defendants for Violations of Section 20(a) of the Exchange Act

126.     Plaintiff reiterates each and every allegation set forth above as if fully set forth herein.

127.     The NGA Founders acted as control persons of NGA within the meaning of Section 20(a) of the Exchange Act as alleged herein.

128.     Bedard and Brunet acted as control persons of Lion Electric within the meaning of Section 20(a) of the Exchange Act as alleged herein.

129.     The Individual Defendants facilitated, and did not stop, the misstatements in the Proxy.

130.     By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the Exchange Act.

131.     As a direct and proximate result of the Individual Defendants' conduct, Plaintiff and the Class have suffered damages and actual economic losses in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.      Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.      Awarding Plaintiff and the Class compensatory and/or rescissory damages sustained as a result of Defendants' wrongdoing, including, but not limited to, pre-judgment and post-judgment interest;

C.      Granting Plaintiff and the Class the costs and disbursements of this action, including reasonable attorneys' fees, expert fees, and expenses;

D.      Awarding extraordinary and/or equitable relief as permitted by law, equity, and the federal statutory provisions sued upon hereunder; and

E.      Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.


Dated: March 22, 2024                    Respectfully submitted,

                                         **MONTEVERDE & ASSOCIATES PC**

                                         */s/ Juan E. Monteverde*
                                         Juan E. Monteverde (JM-8169)
                                         The Empire State Building
                                         350 Fifth Avenue, Suite 4740
                                         New York, NY 10118
                                         Tel: (212) 971-1341
                                         Fax: (212) 202-7880
                                         jmonteverde@monteverdelaw.com

DocuSign Envelope ID: 1DD019B5-26D2-4012-A27E-245038F78600

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, Jacques Jaar ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed a draft of the complaint and has authorized the filing of a complaint substantially similar to the one reviewed.

2.    Plaintiff selects Monteverde & Associates PC and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3.    Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.    Plaintiff sets forth in the attached chart all the transactions in the security that is the subject of the complaint during the class period specified in the complaint.

6.    In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, unless otherwise specified below.

7.    Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this __3/21/2024_____.

DocuSigned by:

*Jacques Jaar*

237825D5B138437...
Signature

| Company Name/Ticker | Transaction (Purchase or Sale) | Trade Date | Quantity |
|---|---|---|---|
| NGA | Buy | 1/19/2021 | 50 |
| NGA | Buy | 1/22/2021 | 24 |
| NGA | Buy | 1/27/2021 | 200 |
| NGA | Sell | 2/3/2021 | -100 |
| NGA | Buy | 3/12/2021 | 60 |
| LEV | Conversion* | 5/7/2021 | 234 |
| LEV | Buy | 11/3/2021 | 90 |
| LEV | Sell | 2/22/2022 | -75 |

*NGA shares converted to LEV shares on May 7, 2021 due to Merger.