**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JACQUES JAAR, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>     v.<br><br>NORTHERN GENESIS ACQUISITION CORP., IAN ROBERTSON, PAUL DALGLISH, MICHAEL HOFFMAN, KEN MANGET, BRAD SPARKES, ROBERT SCHAEFER, THE LION ELECTRIC COMPANY, MARC BEDARD, and NICOLAS BRUNET,<br><br>     Defendants. | **CASE No.: 1:24-cv-02155-JLR**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ........................................................................ 1

II.    JURISDICTION AND VENUE ................................................................... 3

III.   PARTIES .................................................................................................... 3

IV.   SUBSTANTIVE ALLEGATIONS ............................................................. 7

      A.    Background ........................................................................................ 7

      B.    The Business Combination ................................................................ 8

      C.    Lion's Projections Were False and Misleading ................................ 11

      D.    False and Misleading Statements in the Proxy ................................ 18

      E.    As the Market Learned that Lion's Projections Were

           Unattainable, the Value of Its Stock Fell ........................................ 20

V.     PLAINTIFF'S CLASS ACTION ALLEGATIONS ..................................... 22

VI.    NO SAFE HARBOR ................................................................................. 23

VII.   COUNTS .................................................................................................... 24

VIII.  PRAYER FOR RELIEF ............................................................................ 27

IX.   DEMAND FOR TRIAL BY JURY ........................................................... 28

1.      Lead Plaintiff Alex Bouchard-A ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Northern Genesis Acquisition Corp. ("Northern Genesis") and the Lion Electric Company ("Lion" or "Company"), analysts' reports and advisories about the Company, interviews with former Company employees, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

2.      This is a federal securities class action on behalf of persons and entities that exchanged Northern Genesis common stock for Lion common stock pursuant to the joint proxy statement/prospectus filed with the SEC on Schedule 14A by Northern Genesis and Lion on March 24, 2021 ("Proxy"), seeking to recover compensable damages caused by Defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. §240.14a-9) after their Northern Genesis common stock became common stock of Lion. The claim arises from Defendants' negligence and does not assert that Defendants acted with scienter.

3.      Based in material part on grossly inflated forecasts for production and sales, Lion, an all-electric truck and bus manufacturer founded in 2008 and based in Quebec, secured a business combination with Northern Genesis, a blank check company. As Lion failed to approach the false

sales forecasts on which investors based their decision to support the business combination and to exchange their shares in Northern Genesis pursuant to the terms of the business combination agreement, the price of Lion's stock fell far below the prices that Northern Genesis shareholders had paid before the transaction and the value of Lion stock that the transaction used for its exchange ratio.

4.      On May 6, 2021, Northern Genesis and Lion completed their business combination ("Business Combination"), through which Lion Electric Merger Sub Inc., a Delaware corporation and wholly-owned subsidiary of Lion ("Merger Sub") and Northern Genesis merged through a statutory merger with and into Northern Genesis. As a result of the Business Combination, the separate corporate existence of Merger Sub ceased, and Northern Genesis continued as the surviving corporation and a wholly-owned subsidiary of Lion. In the Business Combination, Northern Genesis shareholders' common stock was converted into the right to receive one common share of Lion.

5.      Defendants used the Proxy to solicit Northern Genesis shareholders to approve the Business Combination and to exchange Northern Genesis shares in the Business Combination. The Proxy materially misled investors concerning Lion's business operations and its revenue prospects, which caused investors to vote in favor of the Business Combination and exchange their shares. But the projections for Lion that Defendants included in the Proxy were based on artificially inflated sales assumptions that were impossible to fulfill, and in reality the value of Lion was materially below the per share merger consideration. As the risk of using these artificially inflated assumptions to develop projections materialized, the value of the Company's stock deflated to reflect its actual potential, causing economic loss to Plaintiff and the Class because the false projections in the Proxy induced them to exchange their shares at a ratio that overvalued Lion.

## II.    JURISDICTION AND VENUE

6.    The claims asserted herein arise under and pursuant to Sections 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§78n and §78t(a)) and Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. §240.14a-9).

7.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

8.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the alleged misstatements entered the securities markets from this District and the subsequent damages took place in this District.

9.    In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## III.    PARTIES

10.    Lead Plaintiff, Alex Bouchard-A, as set forth in his previously filed PSLRA Certification (Dkt. No. 18-2), acquired Northern Genesis common stock prior to the Business Combination, and has continuously held Northern Genesis and then Lion common stock at all relevant times.

11.    Defendant Northern Genesis is a blank check company incorporated on May 27, 2020 as a Delaware corporation for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses. Prior to the Business Combination, its principal executive offices were located at 4801 Main Street Suite 100, Kansas City, Missouri. After the Business Combination, Northern Genesis became a wholly owned subsidiary of Lion. According to Lion's March 24, 2021 press release

announcing the effectiveness of Lion's registration statement and the scheduling of the special meeting to approve the Business Combination on April 23, 2021, Northern Genesis and its directors and executive officers and other persons may be deemed to be participants in the solicitations of proxies from Northern Genesis' stockholders in respect of the proposed Business Combination.

12.    Defendant Ian Robertson ("Robertson") co-founded Northern Genesis and served as its director from May 2020 to May 2021, its Chief Executive Officer ("CEO"), Secretary, and Treasurer from May 2020 to June 2020, and its Vice Chairman from June 2020 to May 2021. According to Lion's March 24, 2021 press release announcing the effectiveness of Lion's registration statement and the scheduling of the special meeting to approve the Business Combination on April 23, 2021, Northern Genesis and its directors and executive officers and other persons may be deemed to be participants in the solicitations of proxies from Northern Genesis' stockholders in respect of the proposed Business Combination, making Robertson a proxy solicitor.

13.    Defendant Paul Dalglish ("Dalglish") co-founded Northern Genesis. Dalglish was a director of Northern Genesis in June 2020, and then Chairman from July 2020 to May 2021. According to Lion's March 24, 2021 press release announcing the effectiveness of Lion's registration statement and the scheduling of the special meeting to approve the Business Combination on April 23, 2021, Northern Genesis and its directors and executive officers and other persons may be deemed to be participants in the solicitations of proxies from Northern Genesis' stockholders in respect of the proposed Business Combination, making Dalglish a proxy solicitor.

14.     Defendant Michael Hoffman ("Hoffman") co-founded Northern Genesis and was its President from July 2020 to May 2021. According to Lion's March 24, 2021 press release announcing the effectiveness of Lion's registration statement and the scheduling of the special meeting to approve the Business Combination on April 23, 2021, Northern Genesis and its directors and executive officers and other persons may be deemed to be participants in the solicitations of proxies from Northern Genesis' stockholders in respect of the proposed Business Combination, making Hoffman a proxy solicitor.

15.     Defendant Ken Manget ("Manget") co-founded Northern Genesis. Manget was the Chief Financial Officer ("CFO") of Northern Genesis from June 2020 to May 2021 and a director from July 2020 to May 2021. According to Lion's March 24, 2021 press release announcing the effectiveness of Lion's registration statement and the scheduling of the special meeting to approve the Business Combination on April 23, 2021, Northern Genesis and its directors and executive officers and other persons may be deemed to be participants in the solicitations of proxies from Northern Genesis' stockholders in respect of the proposed Business Combination, making Manget a proxy solicitor.

16.     Defendant Brad Sparkes ("Sparkes") co-founded Northern Genesis and served as its director from July 2020 to May 2021. According to Lion's March 24, 2021 press release announcing the effectiveness of Lion's registration statement and the scheduling of the special meeting to approve the Business Combination on April 23, 2021, Northern Genesis and its directors and executive officers and other persons may be deemed to be participants in the solicitations of proxies from Northern Genesis' stockholders in respect of the proposed Business Combination, making Sparkes a proxy solicitor.

17.    Defendant Robert Schaefer ("Schaefer") co-founded Northern Genesis and served as its director from July 2020 to May 2021. According to Lion's March 24, 2021 press release announcing the effectiveness of Lion's registration statement and the scheduling of the special meeting to approve the Business Combination on April 23, 2021, Northern Genesis and its directors and executive officers and other persons may be deemed to be participants in the solicitations of proxies from Northern Genesis' stockholders in respect of the proposed Business Combination, making Schaefer a proxy solicitor.

18.    Defendant Lion is a Quebec corporation with principal executive offices at 921 chemin de la Rivière-du-Nord, Saint-Jérôme, Quebec, Canada. According to Lion's March 24, 2021 press release announcing the effectiveness of Lion's registration statement and the scheduling of the special meeting to approve the Business Combination on April 23, 2021, Lion Electric and its officers and directors may be deemed participants in the solicitations of proxies from Northern Genesis' stockholders in respect of the proposed Business Combination.

19.    Defendant Marc Bedard ("Bedard") was the CEO of Lion before the Business Combination and has continued to serve as CEO since the Business Combination. He is also a director of Lion. According to Lion's March 24, 2021, press release announcing the effectiveness of Lion's registration statement and the scheduling of the special meeting to approve the Business Combination on April 23, 2021, Lion Electric and its officers and directors may be deemed participants in the solicitations of proxies from Northern Genesis' stockholders in respect of the proposed Business Combination, making Bedard a proxy solicitor.

20.    Defendant Nicolas Brunet ("Brunet") was Executive Vice President ("EVP") and CFO of Lion before the Business Combination. He has been Lion's President since September 2023. According to Lion's March 24, 2021, press release announcing the effectiveness of Lion's

registration statement and the scheduling of the special meeting to approve the Business Combination on April 23, 2021, Lion Electric and its officers and directors may be deemed participants in the solicitations of proxies from Northern Genesis' stockholders in respect of the proposed Business Combination, making Brunet a proxy solicitor.

21.    Defendants Robertson, Dalglish, Hoffman, Manget, Sparkes, and Schaefer (together, "Northern Genesis Founders") and Defendants Bedard and Brunet (together, "Lion Individual Defendants") are the "Individual Defendants." Each of the Individual Defendants solicited proxies from Northern Genesis' stockholders in respect of the proposed Business Combination.

22.    Together, the Individual Defendants, Northern Genesis, and Lion are the "Defendants." Each of the Defendants solicited proxies from Northern Genesis' stockholders in respect of the proposed Business Combination.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background

23.    Lion was incorporated in 2008 under the *Business Corporations Act* (Québec). Lion designs, develops, manufactures, and directly distributes purpose-built all-electric medium and heavy-duty urban vehicles, specifically trucks and school buses. Lion has led the market in the electric school bus sector in particular.

24.    In the Proxy, Lion stated that its line-up of electric vehicles consisted of seven mid-range truck and bus models currently available for purchase as of 2021. It also stated that it had an active product development pipeline and expected to launch eight new mid-range truck and bus models over the following two years. By 2022, the Proxy stated, Lion's management believed that it would have a total of 15 vehicles available for purchase, comprising Class 5, 6, 7 and 8 electric trucks designed for specific applications, Type A, C and D electric school buses, as well as an

electric medium-duty shuttle bus and an electric ambulance.

25.    Northern Genesis was organized in 2020 as a blank check company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination within 24 months. In August 2020, Northern Genesis went public through an initial public offering of 30,000,000 units priced at $10.00 per unit (with each unit consisting of one share of Northern Genesis common stock and one-half of one redeemable warrant, each whole warrant entitling the holder thereof to purchase one share of common stock at a price of $11.50 per share).

**B.    The Business Combination**

26.    Northern Genesis entered into the Business Combination Agreement and Plan of Reorganization ("Business Combination Agreement") with Lion on November 30, 2020. Pursuant to the Business Combination Agreement, Merger Sub would merge through a statutory merger with and into Northern Genesis, with Northern Genesis surviving the Business Combination as a wholly-owned direct subsidiary of Lion. As a consequence of the Business Combination, Lion would become an SEC-registered company listed on the NYSE.

27.    According to the Proxy, as part of its evaluation of the Business Combination, the management and advisors of Northern Genesis conducted due diligence, including concerning Lion's operations and forecasts. This due diligence process informed Northern Genesis management in their decision to enter into the Business Combination and their recommendation that Northern Genesis shareholders vote in favor of it and exchange their Northern Genesis shares.

28.    Under the terms of the Business Combination Agreement, immediately prior to or concurrently with the effective time of the Business Combination, Lion would split each of its common shares into 4.1289 Lion common shares. Then, each share of common stock of Northern Genesis issued and outstanding immediately prior to the effective time of the Business

8

Combination (other than any held as treasury shares not on behalf of third parties and those that would be redeemed at the option of their holders) would be converted into the right to receive from Lion a number of Lion common shares ("Exchange Ratio"), which would initially be one (1), but would be subject to customary adjustments pursuant to the Business Combination Agreement for stock splits, reverse stock splits, stock dividends, reorganizations, recapitalization, reclassification, combination, exchange of shares, or like changes ("Per Share Merger Consideration").

29.    The Proxy was the sole information on which Plaintiff and Northern Genesis shareholders could inform themselves whether to vote for the Business Combination and then either to redeem their Northern Genesis shares or to exchange them at the Exchange Ratio. Indeed, the Proxy stated:

> NGA has supplied all information contained or incorporated by reference in this proxy statement/prospectus relating to NGA, and Lion has supplied all such information relating to Lion or the Merger Sub. NGA and Lion have not authorized anyone to provide you with information that is different from what is contained in this proxy statement/prospectus.
>
> ***You should rely only on the information contained in or incorporated by reference into this proxy statement/prospectus***. No one has been authorized to provide you with information that is different from that contained in or incorporated by reference into this proxy statement/prospectus. This proxy statement/prospectus is dated March 24, 2021. You should not assume that the information contained in this proxy statement/prospectus is accurate as of any date other than that date. You should not assume that the information incorporated by reference into this proxy statement/prospectus is accurate as of any date other than the date of the incorporated document. Neither the mailing of this proxy statement/prospectus to NGA stockholders nor the issuance by Lion of Lion Common Shares pursuant to the Business Combination will create any implication to the contrary. (Emphasis added).

30.    Prior to the Business Combination, as a private company, Lion had a history of losses and negative cash flows from operating activities. For example, incurred net losses of approximately $97.4 million for the year ended December 31, 2020, approximately $3.1 million for the year ended December 31, 2019, and approximately $5.4 million for the year ended

December 31, 2018. Further, Lion had negative cash flows from operating activities of approximately $27.1 million for the year ended December 31, 2020, approximately $7.4 million for the year ended December 31, 2019, and approximately $2.2 million for the year ended December 31, 2018.

31.    The Proxy stated that these losses and negative cash flows resulted from substantial investments Lion made to grow its business, and that Lion expected to make significant expenditures to expand its business in the future, including as a result of expected increases in costs related to: the construction of its planned battery assembly facility and planned large-scale U.S. manufacturing facility; the design, development and production of its new products; the hire of additional employees across all divisions; the production of an inventory of its vehicles; the buildup of inventories of parts and components for its vehicles; the expansion of its design, development, installation and servicing capabilities, including the planned construction of additional research and development centers and Lion experience centers; and an increase in its administrative functions to support its growth.

32.    Lion also forecast substantial growth in its revenues. Even as the Proxy disclaimed Lion's projections as "prepared [] solely for internal use and not with a view toward public disclosure or toward complying with IFRS or the published guidelines of the SEC regarding projections[,]" however, it also stated that the management and Board of Northern Genesis used them to analyze and approve the Business Combination. Accordingly, in the context of a Proxy that purported to inform investors sufficiently to make a decision regarding voting on the Business Combination and then choosing whether to exchange or redeem their shares, these forecasts formed a critical part of investors' valuation of Lion, whether to approve the Business Combination, and then whether to redeem or exchange their shares at the Exchange Ratio.

33.     Notwithstanding Lion's disclaimers about the projections in the Proxy, according to former employees, Lion based its projections on artificially inflated assumptions regarding the number of trucks and school buses that Lion would sell.

34.     As a result, on the basis of the Proxy, including both the projections and the Northern Genesis Board's recommendation—supported by thorough due diligence—investors approved the Business Combination and exchanged their Northern Genesis shares, for materially inadequate Per Share Merger Consideration.

35.     On May 6, 2021, Lion announced the closing of the Business Combination with Northern Genesis.

**C.     Lion's Projections Were False and Misleading**

36.     Multiple former Lion employees knew that the Company's sales staff inflated their pipelines—*i.e.*, projections of future states—to unattainable levels, at the direction of Lion's most senior executives, including Defendant Bedard. The Proxy provided Northern Genesis investors with financial projections based on, among other things, assumptions concerning the number of medium and heavy-duty trucks and school buses that Lion would manufacture and sell. The use of these unattainable pipelines as assumptions in the Proxy projections rendered them false and misleading.

37.     Confidential Witness 1 ("CW1") was the vice president of sales, East, at Lion from March 2018 until February 2020. CW1 reported to Peter Rego ("Rego"), who was then the Company's Chief Commercial Officer ("CCO"). CW1 covered sales for all of the United States except for California.

38.     CW1 recalled that Defendant Bedard told sales staff to change their sales projections to convince potential investors that the Company had a larger pipeline than it really did. CW1 explained that sales staff were told to include every possible sale they could identify in

projections, even if the possibility of actually closing every single such sale was not just unrealistic but impossible given the Company's manufacturing capabilities.

39.    Sometimes, Bedard simply told sales staff to make up inflated numbers for projections. For example, in September 2019, CW1 began preparing sales projections for 2020. Lion was supposedly coming out with an 18-wheeler Class 8 truck in 2020, and the sales team was asked how many they believed they could sell in that year. After going to a number of truck shows and meeting with major trucking companies, CW1 submitted what he believed to be optimistic projection of 10 sales. Defendant Bedard, through Rego, told CW1 that this was an unacceptable projection, and 1,000 would be the right number. CW1 pointed out that at that time, Lion had not even sold 1,000 buses, a sector in which the Company was much more established, let alone trucks. In fact, the highest number of buses Lion had sold in a year prior to 2019 was approximately 50, with 35 of those free to buyers because of grants. After Lion forced him to include 1,000 trucks in his projections for 2020, CW1 resigned from his job and told Rego that he believed that Lion would be lucky to sell five.

40.    CW1 heard that there were design difficulties with Lion's trucks, and that during his time at the Company, the engineering staff could never get the batteries and weight figured out, preventing designs from being finalized, completed, and sold.

41.    Confidential Witness 2 ("CW2") joined Lion as a supply supervisor in January 2019, then became a purchasing manager, and then, from May 2022 until January 2024, director of supply chain. CW2 reported to Jacques Lussier, vice president and senior director of planning.

42.    CW2 confirmed CW1's statement that design difficulties prevented Lion from manufacturing trucks to meet sales forecasts. These design difficulties already existed at the time that the Company went public through the Business Combination.

43.     CW2 recalled that while Lion's goal was to produce 2,500 buses and trucks annually, as of three years ago, it was only making hundreds. CW2 recalls that in 2021, Lion was making approximately five trucks and eight to ten buses per week.

44.     In May 2021, when Lion went public, Lion was supposed to produce 16 trucks per week, and the parts for those units were in CW2's schedule for purchase. But the engineering department was not ready to produce vehicles in those numbers. The drawings and connections were not finished for electric harnesses, and CW2 did not have the information that needed to purchase the needed parts. CW2 was firm that the problem was design, not procurement.

45.     After the Business Combination, Lion executives continued to insist that sales staff artificially inflate sales pipelines for consistency with the projections included in the Proxy. In May 2021, less than one week after the Company went public, Lion hired Brian Piern ("Piern") as its new CCO. In Piern's previous role as Vice President of Sales and Marketing of XL Fleet Corp. ("XL Fleet"), he spearheaded a scheme to mislead investors about revenue projections, in which he instructed employees to record sales opportunities without a reasonable basis, record inflated percentage likelihoods of sales, and maintain pre-existing entries in the records after customers indicated that they would not order XL Fleet's products. The SEC brought charges in the scheme, and Piern was named by XL Fleet investors in a class action lawsuit for securities fraud. Lion brought Piern on to carry on similar practices.

46.     Confidential Witness 3 ("CW3") was a regional sales manager at Lion from March 2020 until December 2021 and national sales manager until June 2022, reporting to CCO Brian Piern ("Piern"), who joined the Company in May 2021.

47.     CW3 confirmed that Lion executives told sales staff to inflate their pipelines. In fact, he was specifically told to create opportunities within the Company's Sales Force system that

did not actually exist. Eric West ("West"), who had been director of channel sales for Lion since October 2020 and then became director of US truck sales under Piern, told CW3 to go into the Sales Force system, create more opportunities, and generate proposals. CW3 recalls that CW5 and CW7 were also on the call when West instructed them to do this, and they agreed to follow his instructions. When CW3 did this, he inflated his pipeline from $58 million to $800 million in potential sales.

48.     Confidential Witness 4 ("CW4") was a sales representative at Lion from June 2020 until March 2022, initially reporting to vice president of North American truck sales Gary Lalond and then to Piern.

49.     CW4 also confirmed that sales staff were expected to keep their pipelines full, even if it was with prospects that were not real. CW4 recalled that Piern instructed sales staff to get as many prospects and quotes as possible. He wanted to see millions upon millions of dollars in the pipeline, whether the Company could possibly close those sales or not.

50.     CW4 additionally corroborated that Lion's production was hampered by engineering problems. Sales staff would receive three or four pieces of literature for the same truck, but each one had different specifications. CW4 stated that there was heavy internal chatter that the engineering department could not get the gross vehicle weight correct for the trucks that were in development.

51.     Confidential Witness 5 ("CW5") was Lion's national sales manager for the East Coast from December 2020 until December 2022, reporting first to Gary Lalond, then to interim vice president of sales Mark McGrew, then to Piern, then to West.

52.     CW5 also corroborated that Lion executives instructed sales staff to artificially inflate sales pipelines. CW5 recalled that sales staff pushed back on these instructions, resulting in

a conference call with West to review pipelines. During that call, West received a call from Piern. Gwin could not hear what Piern said, but after Piern hung up West stated, "Brian said the numbers need to be higher."

53.    As an example of pipeline inflation, CW5 had sold three trucks to PepsiCo. West wanted to know what the total opportunity with PepsiCo could be. CW5 pointed out that Lion did not meet PepsiCo's specs for carrying beverages and did not think that Lion would have that capability over the next three years. West then asked, "If we could meet that payload capacity, what do you think that number would be?" CW5 indicated that in that dream scenario that did not exist with Lion's fleet, he might be able to sell a few thousand trucks. West told CW5 to use that number in his pipeline anyway. CW5 pointed out that this would make his pipeline inaccurate because it would represent opportunities that were not realistic. West told him to do it anyway. CW5's pipeline went from $10 million to approximately $700 million. CW5 then continued going through his pipeline and adding dream scenario numbers. Finally, he received a message from West to stop, indicating that the numbers were now acceptable.

54.    Confidential Witness 6 ("CW6") was the director of sales for the Western U.S. for school buses at Lion from September 2019 until May 2022. CW6 initially reported to Nate Baguio ("Baguio"), the Company's senior vice president of commercial development, and then to Piern.

55.    CW6 explained that the Company's sales projections were also inaccurate because, due to its manufacturing delays and problems, it could not fulfill even legitimate purchase orders. CW6 estimated that his team probably had 450 orders for school buses. Of that amount, approximately 50 to 70 buses were actually delivered. In particular, Lion was not manufacturing its Type D bus, even though CW6 had outstanding orders for it. At one point, the sales team was told to go back to customers and ask them to cancel their orders for Type D buses in favor of Type

C buses. CW6 explained that every single that was delivered from his orders was Type C. Numerous purchasers cancelled orders because the Type D buses were not being delivered.

56.    After CW6 left Lion, he went to work for a competitor, and has since approached Lion customers whose orders Lion failed to fulfill, taken orders from them away from Lion, and delivered buses to them. CW6 estimates that his current team took between 50% to 75% of the Lion school bus orders that were pending when he left the Company.

57.    CW6 also confirmed that the Company had an unrealistic sales pipeline prior to the Business Combination. CW6 was told that there was enough grant money available for California school districts to order 1,500 electric school buses. His supervisor, Nate Baguio, told him that this meant that he had a 1,500-bus pipeline. CW6 told Baguio that his projection was that Lion might secure about 1% of the available sales, because it was just trying to break into the market. Baguio told him that Lion was going to take 10% of the market. CW6 stated that Lion could never have delivered that many buses.

58.    Indeed, CW6 recalled a meeting with Lion executives where he was asked to sit in for Baguio. When he logged into the meeting, he heard Defendant Bedard say, "Just stop working on the Ds [Type D buses] and get that truck done." CW6 had been upset about Lion not producing the D bus because he had a lot of orders and had been vocal about it. As soon as Bedard realized that CW6 had logged on, he stopped that line of conversation, and later told CW6 in the meeting that the Company would have the Type D bus done in 6 months. In fact, while CW6 left Lion in May 2022, the Company announced only on January 24, 2024 that it had commenced deliveries of Type D buses.

59.    Confidential Witness 7 ("CW7") was the national sales director for the Western U.S. for trucks at Lion from August 2019 until early 2023.

60.    CW7 confirmed that in the truck division, also, Lion misled the sales force about the ability to manufacture vehicles and delivery dates. CW7 sold numerous vehicles, with purchase orders signed and payments transferred, that were never delivered.

61.    More, CW7 corroborated that sales staff were told to inflate pipelines. CW7 recalled that Eric West told him to increase his pipeline by a factor of 10, and recalled a call in which other sales staff (including CW3, CW4 and CW5) received the same instruction.

62.    Confidential Witness 8 ("CW8") was school bus manager for the Pacific Northwest and then the Midwest for Lion from May 2021 until March 2023, reporting first to Baguio and later to director of school bus sales Rick Lee.

63.    CW8 also confirmed that Lion was failing to deliver buses and inflating pipelines. CW8 joined the Company under the impression that it was developing four types of buses, but in his time at Lion, it only actually built one configuration of the Type C bus. CW8 estimated that he had almost 30 signed purchases orders for buses, but only six had been delivered by the time he left.

64.    When CW8 first joined the Company, he took over an account that had what he described as "wildly optimistic" projections for the sales pipeline. CW8 learned later that the pipeline was so bloated because his predecessor had included deals that were not actually likely to close.

65.    Confidential Witness 9 ("CW9") worked for Lion from September 2018 until November 2019 as a sales manager. He initially reported to Tony Watkins ("Watkins"), the Company's vice president of sales, who reported to Rego.

66.    CW9 confirmed that Lion expected sales staff to inflate pipeline reports. In weekly pipeline reports that he prepared and submitted to Watkins, CW9 projected the sale of

approximately 25 to 30 buses, but Watkins told him that that number was not good enough according to Defendant Bedard, and that he needed to project 1,000 sales.

### D. False and Misleading Statements in the Proxy

67. The Proxy included the following financial projections to guide Northern Genesis investors in making their voting decisions on the Business Combination and then to choose whether to exchange or redeem their Northern Genesis shares:

| | July 2020 Forecast | | | | |
| | Fiscal Year Ended December 31, | | | | |
| | 2020E | 2021E | 2022E | 2023E | 2024E |
| | | | (in millions) | | |
| Revenue | $ 29 | $204 | $668 | $1,672 | $3,625 |
| Adjusted EBITDA | (4) | 29 | 119 | 295 | 707 |

The Proxy noted that these projections were based on assumptions that included the number of medium and heavy-duty trucks and school buses that Lion would manufacture and sell.

68. The foregoing projections were materially false and misleading because, according to Lion former employees, Lion based them on the artificially bloated and unachievable sales pipeline.

69. More, the Proxy warned of risks that had already materialized. The Proxy stated:

***Lion's operating and financial results forecast relies in large part upon assumptions and analyses developed by it and NGA. If these assumptions or analyses prove to be incorrect, Lion's actual operating and financial results may be materially different from its forecasted results.***

The projected financial and operating information of Lion appearing elsewhere in this proxy statement/prospectus reflects current estimates of future performance made by it and NGA. Whether actual operating and financial results and business developments will be consistent with those expectations and assumptions as reflected in projected financial and operating information depends on a number of factors, some of which are outside Lion's control, including, but not limited to:

- its ability to economically manufacture and distribute its vehicles at scale and meet customers' business needs;

- its ability to obtain sufficient capital and successfully execute its growth

strategy, including planned additions to its current manufacturing plant, property and equipment as well as the construction of its additional planned large-scale U.S. manufacturing facility and battery assembly facility;

- its ability to manage its growth;

- its ability to accurately forecast supply and demand;

- its ability to secure and maintain required strategic supply arrangements;

- projected improvements in technology;

- rates of adoption of battery electric vehicles by customers in the markets in which it operates;

- continued availability of favorable regulations and government incentives affecting the industry and markets in which it operates;

- competition, including from established and future competitors;

- its ability to attract and retain management or other employees who possess specialized market knowledge and technical skills; and

- the overall strength and stability of the U.S. and Canadian economies.

Unfavorable changes in any of these or other factors, some of which are beyond Lion's control, could cause actual results to differ materially from Lion's forecasts and projections and other forward-looking information included in this proxy statement/prospectus, and could materially and adversely affect Lion's business, results of operations or financial condition.

70.     This risk had already materialized by the time the Proxy was issued, however,

because the Proxy provided forecasts that were based on artificially inflated false sales projections.

71.     The Proxy also warned:

**Lion may not be able to adequately forecast the supply and demand for its vehicles, its manufacturing capacity or its profitability under long term supply arrangements, including the MPA with the Specified Customer, which could result in a variety of inefficiencies in its business and hinder its ability to generate revenue.**

It is difficult to predict Lion's future sales and appropriately budget for Lion's expenses, and Lion may have limited insight into trends that may emerge and affect

its business. Lion will be required to provide forecasts of its demand to its suppliers several months prior to the scheduled delivery of products to customers. Currently, there is limited historical basis for making judgments on the future demand for Lion's vehicles or its ability to mass develop, manufacture and deliver vehicles at scale, or Lion's profitability in the future. If Lion fails to accurately predict its manufacturing requirements, it could incur additional costs or experience delays. If Lion overestimates manufacturing requirements, its suppliers may have excess inventory, which indirectly would increase Lion's costs. If Lion underestimates manufacturing requirements, its suppliers may have inadequate inventory, which could interrupt manufacturing of Lion's vehicles and result in delays in shipments and revenues. In addition, lead times for materials and components that Lion's suppliers order may vary significantly and depend on factors such as the specific supplier, contract terms and demand for each component at a given time. If Lion fails to order sufficient quantities of product components in a timely manner, the delivery of vehicles to its customers could be delayed, which could materially adversely affect its business, results of operations or financial condition.

In addition, the MPA (as defined below) with the Specified Customer (as defined below) requires Lion to reserve necessary manufacturing capacity to deliver up to 500 trucks per year from 2021 to 2025 and the greater of 500 trucks per year or 10% of Lion's manufacturing capacity from 2026 to 2030, which could hinder Lion's ability to capitalize on future business opportunities. Moreover, some of Lion's customers, including the Specified Customer under the MPA, operate on a purchase order basis, which means such customers are not required to purchase any specified minimum quantity of vehicles beyond the quantities in an existing purchase order and may in certain circumstances cancel or reschedule purchase orders on relatively short notice. Cancellations or rescheduling of customer orders could result in the delay or loss of anticipated sales without allowing sufficient time to reduce, or delay the incurrence of, corresponding inventory and operating expenses, which could materially adversely affect Lion's business, results of operations or financial condition.

72.    Even as the Proxy warned investors concerning the risk of an inability to accurately predict sales and manufacturing, this risk had already materialized because the Proxy's forecasts included artificially inflated false sales projections.

### E.    As the Market Learned that Lion's Projections Were Unattainable, the Value of Its Stock Fell

73.    After Northern Genesis and Lion completed the Business Combination, the reality of Lion's financial and operational state gradually became clear. As the market corrected its valuation of Lion, then, the value of its stock materially declined. After its May 31, 2021, peak

closing price of $20.44 per share, Lion stock began gradually dropping in value. On August 26, 2024, it closed at $0.71 per share.

74.     The Proxy had provided the following forecasts for Lion's performance:

| | July 2020 Forecast | | | | | | | | |
| | Fiscal Year Ended December 31, | | | | | | | | |
| | 2020E | | 2021E | | 2022E | | 2023E | | 2024E |
| | | | | | (in millions) | | | | |
| Revenue | $ | 29 | $ | 204 | $ | 668 | $ | 1,672 | $ | 3,625 |
| Adjusted EBITDA | | (4) | | 29 | | 119 | | 295 | | 707 |

75.     But because they were based on artificially inflated assumptions regarding the number of trucks and school buses that Lion would sell, the forecasts in the Proxy have proved to be orders of magnitude higher than the Company's actual performance.

76.     On March 29, 2022, Lion filed its first post-Business Combination annual report on Form 20-F with the SEC, reporting its results for the fiscal year ending December 31, 2021. The Company reported $57.7 million in revenue and adjusted EBITDA of negative $7.5 million.

77.     On March 10, 2023, Lion filed its annual report on Form 40-F with the SEC, reporting its results for the fiscal year ending December 31, 2022. The Company reported $139.9 million in revenue and adjusted EBITDA of negative $54.8 million.

78.     On February 29, 2024, Lion filed its annual report on Form 40-F with the SEC, reporting its results for the fiscal year ending December 31, 2023. The Company reported $253.5 million in revenue and adjusted EBITDA of negative $34.3 million.

79.     The dramatic differences between the Proxy's projections and the Company's actual results show that the Proxy provided projections that were artificially inflated, as Lion's former employees describe. As the market gradually absorbed this reality and corrected its valuation of the Company, Lion's stock declined in value.

80.     Investors were economically damaged because, on the basis of the Proxy, they approved the Business Combination and exchanged their shares at the Exchange Ratio.

## V.    PLAINTIFF'S CLASS ACTION ALLEGATIONS

81.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all shareholders of Northern Genesis who were solicited to approve the Business Combination and to exchange rather than redeem Northern Genesis shares pursuant to the Proxy, and who were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

82.     The members of the Class are so numerous that joinder of all members is impracticable. At the time that the Proxy was issued, there were 39,931,680 shares of Northern Genesis common stock issued and outstanding. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions.

83.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

84.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

85.     Common questions of law and fact exist as to all members of the Class predominate over any questions solely affecting individual members. Among the questions of law and fact common to the Class are:

a.      whether Defendants' acts as alleged violated the federal securities laws;

b.      whether the Proxy misrepresented material facts about the financial condition, business, operations, and management of the Company;

c.      whether the Proxy omitted material facts necessary to make its contents not misleading;

d.      whether the Business Combination artificially overvalued Lion and thus provided an Exchange Ratio that overvalued Lion; and

e.      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

86.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VI.    NO SAFE HARBOR

87.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could

cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by a proxy solicitor who knew that the statement was false when made.

## VII.    COUNTS

### COUNT I

### Violation of Section 14 of the Exchange Act and SEC Rule 14a-9 Against All Defendants

88.    Plaintiff repeats and reallege each and every allegation contained above as if fully set forth herein.

89.    This claim does not sound in fraud. For the purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely on negligence. Plaintiffs do not allege that Defendants had scienter or fraudulent intent with respect to this Count

90.    This claim is brought against the Defendants pursuant to Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a 9 promulgated thereunder (17 C.F.R. § 240.14a 9), on behalf of all shareholders of who were solicited to approve the Business Combination and to exchange their Northern Genesis shares at the Exchange Ratio pursuant to the Proxy.

91.    The Proxy contained statements that, at the time and in light of the circumstances under which they were made, were false and misleading with respect to material facts, and omitted to state material facts necessary in order to make the statements therein not false or misleading.

92.     The Defendants prepared, reviewed, and/or disseminated the Proxy without sufficient meaningful cautionary language.

93.     Defendants, jointly and severally, solicited and/or permitted use of their names in solicitations contained in the Proxy and other proxy solicitation materials.

94.     By means of the Proxy and documents attached thereto or incorporated by reference therein and other proxy solicitation materials, Defendants sought to secure Plaintiff's and other Class members' approval of the Business Combination and solicited proxies from Plaintiff and other members of the Class.

95.     Each Defendant acted negligently in making inaccurate statements of material facts, and/or omitting material facts required to be stated in order to make those statements not misleading, and failing to include adequate meaningful risk disclosures. Defendants were required to ensure that the Proxy and all other proxy solicitation materials fully and fairly disclosed all material facts to allow an investor to make an informed investment decision.

96.     As a direct result of the Defendants' negligent preparation, review and dissemination of the Proxy, members of the Class were induced to vote their shares and accept inadequate consideration in connection with the Business Combination, and precluded from exercising their right to seek redemption of their Northern Genesis shares prior to the Business Combination, on a fully informed basis. The Proxy used to obtain shareholder approval of the Business Combination deprived Class members of their right to a fully informed shareholder vote in connection therewith and the full and fair value for their Northern Genesis shares. At all times relevant to the dissemination of the Proxy, these Defendants were aware of and/or had access to the true facts concerning Lion. Thus, as a direct and proximate result of the dissemination of the Proxy that Defendants used to obtain shareholder approval of and thereby consummate the

Business Combination, the Class suffered damages and actual economic losses in an amount to be determined at trial.

97.    The Proxy was an essential link in the accomplishment of the Business Combination.

98.    Plaintiff and other members of the Class eligible to vote on the Business Combination were misled by Defendants' false and misleading statements and omissions, were denied the opportunity to make a fully informed decision in voting on the Business Combination and regarding whether to redeem or exchange their Northern Genesis shares, and were damaged as a direct and proximate result of the untrue statements and omissions set forth herein.

99.    The false and misleading statements and omissions in the Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the Business Combination and whether to redeem or exchange their Northern Genesis shares. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy.

100.    The untrue statements and omissions as set forth above proximately caused foreseeable losses to Plaintiff and other members of the Class.

101.    This claim is brought within the applicable statute of limitations.

102.    By reason of the foregoing, the Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a 9.

**COUNT II**

**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

103.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

104.    The Individual Defendants acted as controlling persons of Northern Genesis (the Northern Genesis Founders) and Lion (the Lion Individual Defendants) within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their participation in and/or awareness of the Company's operations and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Northern Genesis and Lion, including the content and dissemination of the Proxy, which Plaintiff contends was false and misleading. The Individual Defendants were provided with or had unlimited access to copies of Lion's Proxy and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

105.    In particular, the Lion Individual Defendants had direct and supervisory involvement in the day-to-day operations of Lion and, therefore, had the power to control or influence the way that the Company's projections were developed, and exercised the same.

106.    As set forth above, Defendants each violated Section 14(a) by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## IX.     DEMAND FOR TRIAL BY JURY

107.     Plaintiff hereby demands a trial by jury.

Dated: August 27, 2024                                   Respectfully submitted,

                                                         **THE ROSEN LAW FIRM, P.A.**


                                                         By: /s/ *Jacob A. Goldberg*
                                                         Jacob A. Goldberg
                                                         Leah Heifetz-Li
                                                         101 Greenwood Avenue
                                                         Suite 440
                                                         Jenkintown, PA 19046
                                                         Tel: (215) 600-2817
                                                         Fax: (212) 202-3827
                                                         Email: jgoldberg@rosenlegal.com
                                                                  lheifetz@rosenlegal.com

                                                         *Lead Counsel for Lead Plaintiff and the Class*