UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ALEX BOUCHARD-A, *individually and on behalf of all others similarly situated*,

Plaintiff,

-against-

NORTHERN GENESIS ACQUISITION CORP.,
IAN ROBERTSON, PAUL DALGLISH, MICHAEL
HOFFMAN, KEN MANGET, BRAD SPARKES,
ROBERT SCHAEFER, THE LION ELECTRIC
COMPANY, MARC BEDARD, and NICOLAS
BRUNET,

Defendants.

Case No. 1:24-cv-02155 (JLR)

<u>**OPINION AND ORDER**</u>

---

JENNIFER L. ROCHON, United States District Judge:

On May 6, 2021, Northern Genesis Acquisition Corp. ("NGA") and the Lion Electric
Company ("Lion") consummated a business combination (the "Business Combination"), with
NGA thereafter continuing as a wholly owned subsidiary of Lion. Lead Plaintiff Alex
Bouchard-A ("Plaintiff"), individually and on behalf of others similarly situated, asserts that
NGA and Lion, together with other defendants, filed a false and misleading proxy statement
in connection with a May 2021 de-SPAC transaction, in violation of Section 14(a) of the
Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(a)), and Rule 14a-9
promulgated thereunder, 17 C.F.R. § 240.14a-9. Specifically, Plaintiff alleges that the proxy
omitted then-existing facts about Lion's sales pipelines that rendered Lion's financial
projections materially false. Plaintiff also alleges that individual officers at Lion and NGA,
including Michael Hoffman ("Hoffman"), a cofounder and President of NGA from July 2020
to May 2021, are liable for violating Section 14(a) and are also liable under Section 20(a) of
the Exchange Act as controlling persons.

1

Plaintiff has served only Defendants NGA and Hoffman.  Dkts. 8, 9.  NGA and Hoffman initially moved to dismiss the Amended Complaint for failure to state a claim for relief pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6).  Dkt. 48.  NGA subsequently filed for bankruptcy on December 18, 2024, subjecting it to a bankruptcy stay under 11 U.S.C. § 362.  Dkt. 56.  Thus, the only claims presently before this Court for review are those against Hoffman and, for the reasons set forth below, Hoffman's motion to dismiss the Amended Complaint is GRANTED.

**BACKGROUND[1]**

### I.  Factual Allegations

### A.  The Business Combination

Lion is a corporation based in Québec, Canada, that develops, manufactures, and directly distributes purpose-built all-electric medium and heavy-duty urban vehicles, specifically trucks and school buses.  Dkt. 47 ("Amended Compl." or "AC")  ¶¶ 18, 23.  Defendant NGA was a blank-check company incorporated in Delaware.  AC ¶ 11.  Hoffman cofounded NGA and was its President from July 2020 to May 2021.  AC ¶ 14.  Plaintiff acquired NGA common stock prior to the Business Combination and has continuously held NGA and Lion common stock.  AC ¶ 10.

On November 30, 2020, Lion and NGA entered into a Business Combination Agreement and Plan of Reorganization.  AC ¶ 26.  On March 24, 2021, NGA and Lion filed a joint proxy statement and prospectus with the SEC (the "Proxy").  AC ¶ 2.  Lion's March 24,

---

[1] In considering Hoffman's motion to dismiss, the Court considers "facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference," and "documents not expressly incorporated by reference in the complaint that are nevertheless 'integral' to the complaint."  *Clark v. Hanley*, 89 F.4th 78, 93 (2d Cir. 2023) (alterations adopted) (citation omitted).  This includes the March 24, 2021 Proxy, which is incorporated by reference in the Complaint.

2021 press release announced the effectiveness of Lion's registration and the scheduling of the special meeting to approve the Business Combination on April 23, 2021.  AC ¶ 14. Hoffman was a proxy solicitor because, according to this press release, "Northern Genesis and its directors and executive officers and other persons may be deemed to be participants in the solicitations of proxies from Northern Genesis' stockholders in respect of the proposed Business Combination[.]" AC ¶ 14.

On May 6, 2021, NGA and Lion completed their Business Combination, through which Lion Electric Merger Sub Inc., a wholly owned subsidiary of Lion, and NGA merged with and into NGA.  AC ¶ 4.  The Business Combination converted NGA shareholders' common stock into the right to receive one common share of Lion.  AC ¶ 4; *see also* AC ¶ 28. Following the Business Combination, the value of Lion's stock deflated, "causing economic loss to Plaintiff and the Class because the false projections in the Proxy induced them to exchange their shares at a ratio that overvalued Lion."  AC ¶ 5; *see also* AC ¶ 73.

### B.  The Proxy Statement

The Proxy cautioned that it contained "forward-looking statements," including "statements about Lion's and/or NGA's beliefs and expectations" that "should be evaluated as such."  Dkt. 50-1 ("Proxy") at 16.

Moreover, in setting forth NGA's recommendation to approve the Business Combination, the Proxy disclosed various "[r]isks [r]elated to Lion's [b]usiness," including but not limited to:

- "Lion's ability to develop, manufacture and distribute vehicles of sufficient quality and appeal to customers on schedule and at scale";

- The accuracy and reliability of the "assumptions and analyses" underlying "Lion's operating and financial results forecast";

- Lion's ability to "successfully implement its growth strategy, on a timely basis or at all" and to "effectively" "manage future growth"; and

- Potential "delays in the design, production and launch of its new products."

Proxy at 21-27.

The Proxy also disclosed Lion's unaudited prospective financial information. Specifically, the Proxy projected $204 million in revenue for 2021, $668 million in revenue for 2022, $1,672,000,000 in revenue in 2023, and $3,3625,000,000 in revenue in 2024. AC ¶ 67; Proxy at 103. However, the Proxy noted that "Lion does not, as a matter of general practice, develop or publicly disclose long-term forecasts or internal projections of its future financial or operational performance, revenue, financial condition or other results." Proxy at 101. Therefore, the Proxy advised shareholders that "[t]he inclusion of financial projections in this proxy statement/prospectus should not be regarded as an indication that NGA, Lion, their respective directors, officers, advisors or other representatives considered, or now consider, such financial projections necessarily to be predictive of actual future results or to support or fail to support your decision whether to vote for or against the Business Combination Proposal." Proxy at 101. The Proxy also warned: "Lion may not be able to adequately forecast the supply and demand for its vehicles, its manufacturing capacity or its profitability under long term supply arrangements, including the MPA with the Specified Customer, which could result in a variety of inefficiencies in its business and hinder its ability to generate revenue." Proxy at 26. The Proxy further cautioned that "Lion's operating and financial results forecast relies in large part upon assumptions developed by it and NGA. If these assumptions or analyses prove to be incorrect, Lion's actual operating and financial results may be materially different from its forecasted results." Proxy at 21; *see also* Proxy at 101 ("These financial projections reflect numerous estimates and assumptions with respect to

industry performance, general business, economic, regulatory, market and financial conditions and other future events . . . all of which are difficult to predict and many of which are beyond Lion's control.").

With respect to Lion's product-development pipeline, the Proxy represented that "Lion's growing line-up of purpose-built all-electric vehicles consists of seven mid-range truck and bus models," and that the company expected to launch "eight new mid-range truck and bus models over the next two years," with an expected total of fifteen electric vehicles by 2022, "comprising Class 5, 6, 7 and 8 electric trucks designed for special applications, Type A, C and D electric school buses, [and] an electric medium-duty shuttle bus and an electric ambulance." Proxy at 133.

According to the Proxy, "NGA's management and NGA's advisors" conducted due diligence in advance of the Business Combination, including with respect to "Lion's business model, operations and forecasts; legal, tax and accounting due diligence reviews conducted by NGA's advisors; consultation with legal and financial advisors and industry experts; financial and valuation analysis of Lion and the Business Combination; and the financial statements of Lion." Proxy at vi. The Proxy noted, however, that "NGA's due diligence investigation of Lion and factors affecting its business may not surface all material issues, including issues or circumstances that could have a significant effect on Lion's financial condition, results of operations and stock price, which could cause NGA stockholders to lose some or all of their continuing investment." Proxy at 55.

Lion further represented in the Business Combination Agreement and Plan of Reorganization "that the information supplied by [Lion] for inclusion in the Merger Materials shall not, at (i) the time the Registration Statement is declared effective, (ii) the time the Merger Materials are mailed to NGA's stockholders and (iii) the time of the NGA

Stockholders' Meeting, include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading."  Dkt. 67-1 at 9.

### C.  Lion's Alleged Inflation of the Sales Pipeline

According to Plaintiff, the Proxy "materially misled investors concerning Lion's business operations and its revenue prospects," causing investors to vote in favor of the Business Combination and exchange their shares.  AC ¶ 5.  Specifically, Plaintiff asserts that the Proxy incorporated financial projections based on artificially inflated sales assumptions that were "impossible to fulfill."  AC ¶ 5.  Plaintiff alleges that "[a]s the risk of using these artificially inflated assumptions to develop projections materialized, the value of [Lion's] stock deflated to reflect its actual potential, causing economic loss to Plaintiff and the Class because the false projections in the Proxy induced them to exchange their shares at a ratio that overvalued Lion."  AC ¶ 5.

In support of the assertion that the Proxy contained false and misleading statements, the Amended Complaint relies upon the statements of nine confidential witnesses ("CWs") from Lion, who claim that Lion's sales staff inflated their projections of future sales "at the direction of Lion's most senior executives," including the company's CEO, Marc Bedard.  AC ¶ 36; *see* AC ¶¶ 37-66.  For instance:

- CW1, the vice president of sales, East, at Lion from March 2018 until February 2020, AC ¶ 37, recalled Bedard telling sales staff to change their sales projections "to convince potential investors that the Company had a larger pipeline than it really did," AC ¶ 38, including in one instance in September 2019 instructing CW1 to increase his 2020 sales projection from 10 sales to 1,000, AC ¶ 39;

- CW2, a supply supervisor, then purchasing manager and director of supply chain who worked at Lion from January 2019 to January 2024, AC ¶ 41, recalled that, "while Lion's goal was to produce 2,500 buses and trucks annually," as of 2021, "Lion was making approximately five trucks and eight to ten buses per week," AC ¶ 43;

6

- CW3, a regional sales manager at Lion from March 2020 until December 2021 and national sales manager until June 2022, confirmed that "Lion executives told sales staff to inflate their pipelines," recalling that Eric West, the director of channel sales and then director of US truck sales for Lion, instructed him to "go into the Sales Force system, create more opportunities, and generate proposals," inflating CW3's pipeline from $58 million to $800 million in potential sales, AC ¶¶ 46-47;

- CW4, a sales representative from June 2020 and March 2022, recalled that Brian Piern, the company's Chief Commercial Officer ("CCO"), "instructed sales staff to get as many prospects as quotes as possible," AC ¶¶ 48-49; *see also* AC ¶ 45;

- CW5, Lion's national sales manager for the East Coast from December 2020 until December 2022, AC ¶ 51, "corroborated that Lion executives instructed sales staff to artificially inflate sales pipelines," with CW5 in one instance inflating his pipeline from $10 million to approximately $700 million, AC ¶¶ 52-53;

- CW6, the director of sales for the Western United States for school buses at Lion from September 2019 until May 2022, stated that the company "could not fulfill even legitimate purchase orders," recalling that of approximately 450 orders for school buses, his team only delivered approximately 50 to 70 buses, AC ¶¶ 54-55;

- CW7, the national sales director for the Western United States for trucks at Lion from August 2019 until early 2023, AC ¶ 59, confirmed that, in the truck division, "Lion misled the sales force about the ability to manufacture vehicles and delivery dates," recalling one instance where he was told to increase his pipeline "by a factor of 10," AC ¶¶ 60-61;

- CW8, the school-bus manager for the Pacific Northwest and then for the Midwest for Lion from May 2021 until May 2023, "confirmed that Lion was failing to deliver buses and inflating pipelines," AC ¶¶ 62-63;

- CW9, a sales manager from September 2018 until November 2019, recalled Tony Watkins, the Company's vice president of sales, instructing him to inflate weekly projections of sales of approximately 25 to 30 buses to 1,000, AC ¶¶ 65-66; and

- Various CWs also recalled "design difficulties" with Lion's trucks, "exist[ing] at the time that the Company went public through the Business Combination," AC ¶¶ 40-42.

## II.    Procedural History

Jacques Jaar commenced this action against the Defendants on March 22, 2024.

Dkt. 1.  On July 1, 2024, the Court granted Plaintiff's motion for appointment as lead plaintiff.

Dkt. 29.  On August 28, 2024, Plaintiff filed an amended complaint.  *See generally* AC.  On

October 25, 2024, Hoffman and NGA filed a joint motion to dismiss the Amended Complaint. Dkt. 48; Dkt. 49 ("Br").  Plaintiff filed an opposition on December 6, 2024, Dkt. 51 ("Opp."), and Hoffman filed his reply on January 6, 2025, Dkt. 52 ("Reply").

On January 23, 2025, Defendants filed a suggestion of bankruptcy indicating that Lion and NGA were the subject of a proceeding before the Superior Court of Québec, pursuant to the Companies' Creditors Arrangement Act, R.S.C. 1985, c C-36 (Can.) (as amended, the "CCAA"), and that they had filed voluntary petitions in the United States Bankruptcy Court for the Northern District of Illinois, seeking recognition of the Canadian Proceeding in the United States.  Dkt. 55 at 1-2.  On January 24, 2025, the Court stayed this action against NGA and Lion pending resolution of the bankruptcy proceeding or other order by the Bankruptcy Court.  Dkt. 56.  On February 18, 2025, the Court ordered the parties to provide their respective positions on whether NGA and Hoffman's pending motion to dismiss should also be stayed.  Dkt. 57.  Defendants asked the Court to entertain Defendants' motion to dismiss only as to Hoffman, Dkt. 58; Plaintiff, however, requested that the Court consider NGA "as a non-party defendant solely for the purpose" of deciding the motion in full, Dkt. 60 at 1.  The Court held oral argument on the motion to dismiss on June 12, 2025.  Dkt. 68 ("Oral Argument Transcript" or "Tr.").

Given the bankruptcy stay as to Lion and NGA, the Court shall consider the pending motion to dismiss only as to Defendant Hoffman, not as to NGA.  11 U.S.C. § 362, which provides for an automatic stay, "protects bankruptcy estates by restraining any formal or informal action or legal proceeding that might dissipate estate assets or interfere with the trustee's orderly administration of the estate." *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 207 (2d Cir. 2014).  The Court is not persuaded by Plaintiff's initial suggestion that the Court could consider NGA to be a nonparty defendant solely for the purpose of deciding this

motion, *see* Dkt. 60 at 1.  The automatic stay is broad and actions taken in violation of the stay may be void.  *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 527 (2d Cir. 1994) ("[A]ny proceedings or actions described in section 362(a)(1) are void and without vitality if they occur after the automatic stay takes effect.").  Plaintiff has presented no authority to the Court to support the notion that a litigant may avoid the automatic stay on bankruptcy that protects the debtor (and creditors) from continued litigation by simply designating the debtor as a nonparty to a litigation that is otherwise stayed as to that debtor.  Finally, Plaintiff agreed during oral argument to proceed with adjudication of the motion with respect to Hoffman only.  Tr. at 4:13-24.  Therefore, the Court will proceed with considering the motion to dismiss only with respect to Defendant Hoffman.

## LEGAL STANDARDS

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Aschroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A court accepts a complaint's factual allegations as true and draws all reasonable inferences in favor of the plaintiff.  *New Eng. Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 168 (2d Cir. 2023), *amended and superseded on reh'g on other grounds*, 122 F.4th 28 (2d Cir. 2024).  Still, a complaint must allege "more than a sheer possibility that a defendant has acted unlawfully" and "more than facts that are 'merely consistent with' a defendant's liability."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

"Section 14(a) of the Securities Exchange Act of 1934 makes it unlawful for any person to solicit any proxy 'in contravention of such rules and regulations as the Securities

9

and Exchange Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.'" *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1291 (2d Cir. 1973) (alteration adopted) (citation omitted) (quoting 15 U.S.C. § 78n(b)(1)). "Rule 14a-9 in turn prohibits both the inclusion of 'any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact,' and the omission of 'any material fact necessary in order to make the statements therein not false or misleading.'" *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 527, 557 (S.D.N.Y. 2017) (quoting 17 C.F.R. § 240.14a-9(a)). Therefore, "[t]o state a claim under Section 14(a) and Rule 14a-9 promulgated thereunder, a plaintiff must plausibly allege that (1) a proxy statement contained a material 'misstatement or omission,' which (2) caused the plaintiff injury, and (3) 'the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.'" *Rubenstein ex rel. Jefferies Fin. Grp. Inc. v. Adamany*, No. 22-2794, 2023 WL 6119810, at *2 (2d Cir. Sept. 19, 2023) (summary order) (footnote omitted) (quoting *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 384-85 (1970)). Accordingly, "both loss causation and transaction causation must be proven . . . under § 14(a)." *Int'l Bhd. of Teamsters, Garage Emps. Loc. 272 Lab. Mgmt. Pension Fund v. Apple, Inc.*, No. 23-cv-01867 (JLR), 2024 WL 475018, at *4 (S.D.N.Y. Feb. 7, 2024) (omission in original) (quoting *Grace v. Rockenstock*, 228 F.3d 40, 47 (2d Cir. 2000)). "In interpreting the language of a proxy statement, doubts are to 'be resolved in favor of those the statute is designed to protect.'" *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act. (ERISA) Litig.*, 757 F. Supp. 2d 260, 290 (S.D.N.Y. 2010) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448 (1976)).

## DISCUSSION

Plaintiff asserts a Section 14(a) claim against Hoffman, seeking to hold him directly liable for the Proxy's alleged misstatements and omissions, as well as a controlling person liability claim under Section 20(a). The Court shall address these claims in turn.

### I.    Section 14(a) Claim

Hoffman argues that Plaintiff's Section 14(a) claim against him fails for multiple reasons, including because Plaintiff: (1) fails to allege an actionable omission; (2) fails to establish the materiality of the Proxy's alleged omissions; (3) has not adequately pleaded Hoffman's culpability; and (4) does not adequately allege loss causation. *See* Reply at 1-2.

As a threshold matter, however, the Court first addresses whether Plaintiff's Section 14(a) claim against Hoffman is subject to Rule 9(b)'s heightened pleading standards.

### A.    Pleading Standard

Plaintiff maintains that Rule 8(a)'s notice pleading requirements, rather than the heightened pleading requirements of Rule 9(b), apply to Section 14(a) claims alleging negligence. Opp. at 6-7. Hoffman disagrees, arguing that Plaintiff's Section 14(a) claim sounds in fraud and therefore Rule 9(b)'s heightened pleading standard is triggered. Br. at 22-25; Reply at 2-3.

As a general matter, "Section 14(a) does not require a plaintiff to plead 'that a defendant acted with intent to defraud.'" *In re Columbia Pipeline, Inc.*, 405 F. Supp. 3d 494, 506 (S.D.N.Y. 2019) (quoting *comScore, Inc.*, 268 F. Supp. 3d at 557). "In other words, 'a plaintiff may state a Section 14(a) claim by pleading negligence.'" *Id.* (alteration adopted) (quoting *Dekalb Cnty. Pension Fund v. Transocean Ltd.*, 36 F. Supp. 3d 279, 283 (S.D.N.Y. 2014), *aff'd*, 817 F.3d 393 (2d Cir. 2016)). However, "[w]hile 'there is no requirement in the Second Circuit that plaintiffs allege fraud in order to state a cause of action pursuant to

Section 14(a) . . . when plaintiffs assert Section 14(a) claims grounded in alleged fraudulent conduct, they are subject to heightened pleading requirements, . . . even if they disclaim reliance on a fraud theory.'" *Police & Fire Ret. Sys. of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 226 (S.D.N.Y. 2009) (alterations adopted) (omissions in original) (quoting *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005)).

"Rule 9(b) requires that 'in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.'" *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (alteration adopted) (quoting Fed. R. Civ. P. 9(b)). "[The Second Circuit] has read Rule 9(b) to require that a complaint '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Id.* (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)). Rule 9(b) is designed to provide a defendant "fair notice of a plaintiff's claim, to safeguard a defendant's reputation from 'improvident charges of wrongdoing.'" *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) (quoting *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir. 1990)). Therefore, where a complaint sounds in fraud, the plaintiff's allegations are "subject to heightened pleading requirements, . . . even if they disclaim reliance on a fraud theory." *Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 239 (S.D.N.Y. 2012) (omission in original) (citation omitted). As Judge Crotty observed in holding the plaintiff in *Steinberg v. Dimon* to a heightened pleading standard:

> Although the Complaint characterizes the Section 14(a) claim as sounding in negligence, [plaintiff] cannot wish away the heightened pleading standard for fraud. . . . "This is essentially a fraud claim, and Plaintiffs will not be allowed to reclassify their claims to avoid the pleading standards of Rule 9(b)."

No. 14-cv-00688 (PAC), 2014 WL 3512848, at *4 n.5 (S.D.N.Y. July 16, 2014) (quoting *SafeNet*, 645 F. Supp. 2d at 238).

Here, the Amended Complaint alleges that the Proxy "materially misled" investors, AC ¶ 5, and contained "materially false and misleading" projections, *id.* ¶ 68.  Indeed, Plaintiff's driving theory is that Lion executives engaged in a scheme to artificially inflate sales assumptions to "convince potential investors that the [c]ompany had a larger pipeline than it really did." *Id.* ¶ 38; *see also id.* ¶ 45 (noting that Lion's CCO, Piern, "spearheaded a scheme to mislead investors about revenue projections" at XL Fleet, and that "Lion brought Piern on to carry on similar practices"); *id.* ¶ 96 (alleging that "Defendants were aware of and/or had access to the true facts concerning Lion").  Therefore, the "wording and imputations of the complaint are classically associated with fraud," *Rombach*, 355 F.3d at 172, such that Rule 9(b)'s heightened pleading standards are triggered.  *See, e.g.*, *id.* (allegations that the registration statement was "inaccurate *and* misleading"; that it contained "*untrue* statements of material facts"; and that "materially *false* and *misleading* written statements were issued" sounded in fraud); *SafeNet*, 645 F. Supp. 2d at 238 (holding that plaintiffs' claims that defendant's officers and directors "failed to properly disclose" improper accounting methods and "that they did so to enrich themselves by inflating . . . stock prices" was "essentially a fraud claim").  The Court shall therefore apply Rule 9(b)'s heightened pleading requirements to Plaintiff's allegations.

### B.  Hoffman's Liability Under Section 14(a)

On a review of the Amended Complaint, even assuming the Proxy contained material omissions, Plaintiff's Section 14(a) claim fails to meet Rule 9(b)'s heightened pleading

standard with respect to Hoffman's actions.[2]

As noted above, "[t]here is no required state of mind for a violation of section 14(a)." *Dekalb Cnty. Pension Fund v. Transocean Ltd.*, 817 F.3d 393, 408 n.90 (2d Cir. 2016) (quoting *Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009)).  However, "[a]lthough a claim under Rule 14a-9 does not require scienter . . . it is not a strict liability provision either." *Zappia v. Myovant Scis., Ltd.*, 708 F. Supp.3d 486, 494 (S.D.N.Y. 2023), *aff'd*, No. 24-253, 2025 WL 338351 (2d Cir. Jan. 30, 2025) (summary order).  Plaintiff argues that the Complaint adequately pleads Hoffman's culpability because (1) he was a "proxy solicitor"; (2) he was the President of NGA during the relevant time period; and (3) the Proxy states that NGA's "management" conducted due diligence of Lion's finances and operations.  Opp. at 21-22.  These allegations are not enough.

The fact that Hoffman was a "proxy solicitor" only brings him within the ambit of Section 14(a).  *See, e.g.*, *In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*, 757 F. Supp. 2d at 293 ("The language of Section 14(a) makes it 'unlawful for any person . . . in contravention of such rules and regulations as the Commission may prescribe . . . to solicit or to permit the use of his name to solicit any proxy.'" (omissions in original) (emphasis omitted) (quoting 15 U.S.C. § 78n(a)(1))).  But his status as a proxy solicitor is not sufficient to support an inference that he acted even negligently.  In other words, whether a defendant "solicited or permitted his or her name to be used in the allegedly unlawful proxy," *id.* at 288 — as necessary to trigger the applicability of Section 14(a) to the defendant in the first

---

[2] The parties agreed at oral argument that if this Court were to decide that Plaintiff had not adequately pleaded negligence with respect to Hoffman, then it need not reach the issue of whether Plaintiff had adequately pleaded an omission theory, the materiality of such alleged omissions, or loss causation.  *See, e.g.*, Tr. at 21:14-23:10; 35:8-24.  The Court therefore does not discuss those elements of Plaintiff's Section 14(a) claim.

instance — is a separate question from whether the defendant acted negligently. *See, e.g.*, *McIntosh v. Katapult Holdings, Inc.*, No. 21-cv-07251 (JPO), 2023 WL 5049044, at *13 (S.D.N.Y. Aug. 8, 2023) (separately assessing whether defendant was involved in company's proxy solicitation and therefore liable under Section 14(a), and whether plaintiffs adequately pleaded negligence).

Nor are Plaintiff's allegations that NGA "management" conducted due diligence or that Hoffman was the President of NGA during the relevant time period sufficient to meet Rule 9(b)'s heightened pleading standard. Plaintiff does not allege that Hoffman himself conducted due diligence or allege facts supporting an inference that Hoffman knew or should have known that Lion was inflating its sales pipeline, for instance, because red flags were uncovered during due diligence. In other words, the fact that Hoffman was President of NGA (and therefore presumably oversaw management in its due-diligence process) does not mean that one can infer that he should have known about material omissions in the Proxy. Similar allegations were found insufficient in *SafeNet*. There, as here, the court found that plaintiffs' Section 14(a) claims sounded in fraud and applied Rule 9(b)'s heightened pleading standard. 645 F. Supp. 2d at 239. But the court held that plaintiffs "fail[ed] to meet that standard by simply alleging that the [c]orporate [d]irector [d]efendants had the requisite state of mind because they signed certain documents or because of their positions, rather than alleging with more specificity their knowledge of the allegedly fraudulent stock-options reporting." *Id.* Here, Hoffman did not even sign the Proxy statement; that was left to Ian Robertson, the cofounder of NGA and its Director during the relevant time period. Proxy at 9. Plaintiff's allegations that Hoffman, as President of NGA, would have overseen diligence and therefore should have been aware of any irregularities or deficiencies in the sales forecasts effectively

amounts to little more than an assertion that, because of his executive position, Hoffman acted negligently. But, as in *SafeNet*, that does not suffice.

Similarly, in *Columbia Pipeline,* the court found that the plaintiff did not adequately plead a Section 14(a) claim against director defendants where the plaintiff did "not allege that the [d]irector [d]efendants played a role in the alleged conduct giving rise to th[e] litigation," and instead only "passively assert[ed] that they should have known about th[e] [fraudulent] scheme." 405 F. Supp. 3d at 513. The court, citing *SafeNet*, likewise underscored that the fact that the director defendants signed the proxy was not sufficient to establish a Section 14(a) violation. *Id.* Interpreting Rule 9(b)'s heightened pleading standard as applied to a Section 14(a) claim, *Columbia Pipeline* emphasized that Rule 9(b) "does not apply selectively," but instead applies "to each alleged wrongdoer, and all alleged instances in the complaint." *Id.* at 513-14. Taken together, these authorities show that Rule 9(b) is not satisfied through conclusory assertions regarding a defendant's involvement in a proxy or a defendant's position in a company. Rather, Plaintiff must "state with specificity the conduct that contributed to the . . . [d]efendant's Section 14(a) violation." *Id.* at 514. He has not done so here.

Plaintiff's cited authorities do not compel a contrary result. *Fresno County Employees' Retirement Assoc. v. comScore, Inc*., cited by Plaintiff at oral argument, Tr. at 28:5-20, found plaintiffs had plausibly alleged that defendants were negligent for a failure to "fairly and fully apprise investors" of the risks associated with the underlying merger, where the defendants' due diligence identified certain "red flags" in comScore's accounting. 268 F. Supp. 3d at 560-61. There, the proxy represented that the "Rentrak Board met to review the status of the discussions with comScore, with a focus on results of the due diligence process." *Id.* at 561 (citation omitted). The proxy failed to disclose, however, that Rentrak's auditor,

Grant Thornton, had identified information suggesting that "comScore's revenue numbers could be overstated," including because of comScore's "accounting for nonmonetary transactions." *Id.* at 560-61. There are no comparable allegations here, or any suggestion that Hoffman possessed any information alerting him to deficiencies in Lion's financial forecasting. There are no allegations, for instance, that the internal observations by Lion CWs were shared with Hoffman, or that he had any reason to know that Lion's forecasts were materially misleading. To the contrary, Lion represented that the information supplied for inclusion in the merger materials did not "include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein . . . not misleading." Dkt. 67-1 at 9.

For the first time at oral argument, Plaintiff suggested that Hoffman should have been alerted to potential deficiencies in Lion's forecasts given Lion's "history of losses [and] negative cash flows from operating activities." Tr. at 28:5-20; *see also* AC ¶ 3. The Proxy explains, however, that those "losses and negative cash flows [were] the result of the substantial investments Lion made to grow its business," and that Lion expected "to make significant expenditures to expand its business in the future," including with respect to "the design, development and production of its new products"; "the production of an inventory of its vehicles"; and "the buildup of inventories of parts and components for its vehicles." Proxy at 24. These assertions are consistent with an inference of future growth in Lion's sales pipeline. That Lion had previously experienced losses and negative cash flows is therefore hardly a "red flag[]," *comScore*, 268 F. Supp. at 560, such that the Court can infer Hoffman knew or should have known of material omissions from Lion's financial projections.

Moreover, although the Second Circuit in *Wilson v. Great American Industries, Inc.* stated in dicta that, as a "matter of law, the preparation of a proxy statement by corporate

insiders containing materially false or misleading statements or omitting a material fact is sufficient to satisfy the . . . negligence standard," 855 F.2d 987, 995 (2d Cir. 1988), "the court in *Wilson* did not hold that any material misstatement in a proxy establishes negligence," *Karp v. First Conn. Bancorp, Inc.*, 535 F. Supp. 3d 458, 474 (D. Md. 2021), *aff'd*, 69 F.4th 223 (4th Cir. 2023). Rather, the *Wilson* court found that Section 14(a) claims were adequately pleaded against defendants because the defendants "knew of" the material omission in advance of the shareholder vote on the merger and their nondisclosure was therefore a "deliberate decision." *Wilson*, 855 F.2d at 995. *Wilson*'s holding is therefore narrower than its dicta. In any event, subsequent courts have clarified that Section 14(a) is not a strict-liability provision. *See, e.g.*, *Zappia*, 708 F. Supp.3d at 494.

A review of other cases in this district that have upheld Section 14(a) claims further evinces that something more than the cursory allegations asserted here is needed. *See, e.g.*, *In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 757 F. Supp. 2d at 324-25 (finding negligence standard satisfied where directors "were aware of the bonus agreement" at issue, "and a review of the Joint Proxy would have shown them that the agreement was not disclosed"); *Transocean*, 866 F. Supp. 2d at 246 (finding complaint's allegations sufficient to establish Section 14(a) claim where the complaint "identifie[d] numerous reports and complaints, received by Transocean's management, that detailed the deficiencies in Transocean's safety, training, and inspection protocols").

The Proxy itself also acknowledged — and informed shareholders — that "NGA's due diligence investigation of Lion and factors affecting its business may not surface all material issues, including issues or circumstances that could have a significant negative effect on Lion's financial condition, results of operation and stock price, which could cause NGA stockholders to lose some or all of their continuing investment." Proxy at 55. *See, e.g*, *In re*

*Lottery.com, Inc. Sec. Litig.*, 765 F. Supp. 3d 303, 363 (S.D.N.Y. 2025) (noting that, although president of acquired company undertook due diligence in advance of the business combination's consummation, the proxy expressly cautioned shareholders of the risk that due diligence might not have "uncovered all material issues").

Accordingly, the Court will dismiss the Section 14(a) claim against Hoffman for failure to state a claim.[3]

## II.   Section 20(a) Claim

Plaintiff also seeks to hold Hoffman liable under a theory of control-person liability. "Section 20(a) of the Exchange Act provides that individual executives, as 'controlling persons' of a company, are secondarily liable for their company's violations of the Exchange Act." *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (alteration adopted) (quoting 15 U.S.C. § 78t(a)). "Thus, liability under Section 20(a) is 'derivative of liability under some other provision of the Exchange Act.'" *Lottery*, 765 F. Supp. 3d at 365 (quoting *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 253 n.2 (2010)). To establish control-person liability under Section 20(a), a plaintiff must show by a preponderance of the credible evidence that there was "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's

---

[3] Even if Rule 8's notice pleading requirement was applied, the Court would still find that Plaintiff has not adequately pleaded negligence. *See, e.g., Gould v. Am. Hawaiian S.S. Co.*, 351 F. Supp. 853, 865 (D. Del. 1972) ("[T]he negligence standard [in section 14(a)] does not impose upon directors the role of guarantors or insurers of the accuracy of proxy statements. . . . [S]ome degree of culpability must be established to recover damages."); *Lottery.com*, 765 F. Supp. 3d at 362 (finding that, even under a "liberal" pleading standard, plaintiff's Section 14(a) claim against company's president failed where the president "was never an officer or director" of the company allegedly engaged in fraudulent conduct, and the proxy statement alerted shareholders as to potential deficiencies in due diligence).

fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 108 (2d Cir. 2007); *see also*

*Bond Opportunity Fund v. Unilab Corp.*, No. 99-cv-11074 (SM), 2003 WL 21058251, at *11

(S.D.N.Y. May 9, 2003) (applying aforementioned test to Section 20 claim where the

underlying violation was of Section 14(a)), *aff'd*, 87 F. App'x 772 (2d Cir. 2004) ; *Bisel v.*

*Acasti Pharma, Inc*., No.21-cv-06051 (KPF), 2022 WL 4538173, at *16 (S.D.N.Y. Sept. 28,

2022) (same).  "While 'allegations of control are not averments of fraud and therefore need

not be pleaded with particularity,' the heightened pleading standards set forth under the

PSLRA 'apply with respect to the third-prong of a Section 20(a) claim, which requires

plaintiffs to allege facts demonstrating that the defendant was a culpable participant.'" *Enzo*

*Biochem, Inc. v. Harbert Discovery Fund, LP*, No. 20-cv-09992 (PAC), 2021 WL 5854075

(S.D.N.Y. Dec. 9, 2021) (quoting *DoubleLine Cap. LP. V. Construtora Norberto Odebrecht*,

*S.A.*, 413 F. Supp. 3d 187, 220 (S.D.N.Y. 2019)).  "[D]etermination of § 20(a) liability

requires an individualized determination of a defendant's control of the primary violator as

well as a defendant's particular culpability." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d

Cir. 1998).

     As an initial matter, in supplemental submissions to the Court, both Plaintiff's and

Hoffman's counsel assert that it is appropriate for the Court to decide the Section 20(a) claim

against Hoffman, notwithstanding the bankruptcy stay against NGA.  *See* Dkt. 66 at 1-2; Dkt.

67 at 1.  The Court agrees.  Indeed, other courts have reached Section 20(a) claims even when

the alleged primary violator is a debtor in bankruptcy.  In doing so, courts treat the liability of

the primary violator "simply [as] an element of proof of a section 20(a) claim," such that

"liability need not be actually visited upon the primary violator before a controlling person

may be held liable for the primary violator's wrong."  *In re Thornburgh Mortg. Inc. Sec.*

*Litig.*, 824 F. Supp. 2d 1214, 1279-80 (D.N.M. 2011) (quoting *In re CitiSource, Inc. Sec.*

*Litig.*, 694 F. Supp. 1069, 1077 (S.D.N.Y. 1988)) (collecting cases), *aff'd sub nom. Slater v.
A.G. Edwards & Sons, Inc.*, 719 F.3d 1190 (10th Cir. 2013); *see also In re Suprema
Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 285-86 (3d Cir. 2006) (deciding Section 20(a)
control-person liability against individual officers, notwithstanding insolvency of corporate
entity, which was "the primary violator"); *Pang v. Levitt*, No. 22-cv-01191, 2023 WL
11643704, at *18 (W.D. Tex. Dec. 20, 2023) ("Courts have . . . held that the Bankruptcy
Code's automatic-stay provision, 11 U.S.C. § 362(a)(1), does not prevent a plaintiff from
asserting a control-person claim when the primary violator, as here, is a corporation in
bankruptcy."), *dismissed on reconsideration on other grounds*, 2024 WL 2108842 (W.D. Tex.
Apr. 22, 2024).  The Court therefore decides Hoffman's liability under Section 20(a), without
making any determination as to NGA's liability as a primary violator under Section 14(a).

However, Plaintiff's Section 20(a) claim against Hoffman fails for the same reasons as
his Section 14(a) claim, that is, even assuming a primary violation by NGA, Plaintiff has not
adequately pleaded that Hoffman was a "culpable participant" in the underlying fraud.  *See,
e.g.*, *McIntire v. China MediaExpress Holdings*, *Inc.*, 927 F. Supp. 2d 105, 138 (S.D.N.Y.
2013) (dismissing Section 20(a) claim where plaintiffs "plead[ed] only general and conclusory
allegations" against corporate entities, "failing to set forth particularized facts establishing
their culpable participation in [the] alleged fraud"); *Furlong Fund LLC v. VBI Vaccines, Inc.*,
No. 14-cv-09435 (SHS), 2016 WL 1181710 at *7 (S.D.N.Y. Mar. 25, 2016) ("Plaintiff has
utterly failed to identify the role of each individual defendant in PCC or the Proxy Statement.
The simple allegation that each was an officer or director . . . is an insufficient allegation of
control or culpable participation in the alleged Section 14(a) violation."); *cf. Enzo Biochem*,
2021 WL 5854075, at *8 (finding Section 20 liability for underlying Section 14 violation
where it was a fair inference that "each of the individual counterclaim-director defendants

would have been made aware of, and had some control over, the circumstances surrounding the 2019 Annual Meeting" at issue) (citation and internal quotation marks omitted).

## III.    Leave to Replead

In the event of dismissal, Plaintiff seeks leave to file another amended complaint, which Hoffman opposes. Although a court "should freely give leave" to amend a complaint "when justice so requires," Fed. R. Civ. P. 15(a)(2), "it is within the sound discretion of the district court to deny leave to amend . . . for good reason." *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 447 (2d Cir. 2019) (omission in original) (citation omitted). "The Court will deny a motion to amend where 'the proposed amendments are futile.'" *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 654 B.R. 224, 233 (Bankr. S.D.N.Y. Oct. 4, 2023). Furthermore, "[a] plaintiff need not be given leave to amend if it fails to specify . . . how amendment would cure the pleading deficiencies in its complaint." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014).

At oral argument, Plaintiff's counsel only vaguely stated that an amendment would "add some allegations from people with different perspectives who have knowledge of different aspects of how [Lion] operated, and maybe even different aspects of the proxy." Tr. at 37:19-38:1. Plaintiff has not offered any information to suggest that amendments or additions would cure the substantive deficiencies in Plaintiff's Section 14(a) or Section 20(a) claims against Hoffman. Without further specification as to how any future amendment would pertain to Hoffman's involvement in or awareness of the Proxy's alleged omissions, the Court finds that amendment would be futile.

The Court therefore denies Plaintiff leave to amend.

**CONCLUSION**

For the foregoing reasons, Hoffman's motion to dismiss the Amended Complaint is

GRANTED.  The Section 14(a) and Section 20(a) claims against Hoffman are dismissed with

prejudice.

The Clerk of Court is respectfully directed to terminate the pending motions at Dkts.

48 and 58.

Dated: July 1, 2025
       New York, New York

SO ORDERED.

_Jennifer Rochon_

JENNIFER L. ROCHON
United States District Judge

23